# KIMBALL LAUNDRY CO. *v.* UNITED STATES.

No. 63.   Argued December 7–8, 1948.—Decided June 27, 1949.

*William J. Hotz* argued the cause for petitioner. With him on the brief were *William J. Hotz, Jr.* and *William F. Dalton.*

*Assistant Solicitor General Washington* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Vanech, Roger P. Marquis* and *Wilma C. Martin.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

On November 21, 1942, the United States filed a petition [1] in the United States District Court for the District of Nebraska, to condemn the plant of the Kimball Laundry Company in Omaha, Nebraska, for use by the Army for a term initially expiring June 30, 1943, and to be extended from year to year at the election of the Secretary of War. The District Court granted the United States immediate possession of the facilities of the company, except delivery equipment, for the requested period. The term was subsequently extended several times. The last year's extension was to end on June 30, 1946, but the property was finally returned on March 23, 1946.

The Kimball Laundry Company is a family corporation the principal stockholders of which are three brothers who are also its officers. The Laundry's business has been established for many years; its plant is large and well equipped with modern machinery. After the Army took over the plant, the Quartermaster Corps ran it as a laundry for personnel in the Seventh Service Command. Most of the Laundry's 180 employees were retained, and one of the brothers stayed on as operating manager. Having no other means of serving its customers, the Laundry suspended business for the duration of the Army's occupancy.

---

[1] The petition was filed under § 201 of Title II of the Second War Powers Act of 1942, 56 Stat. 176, 177, 50 U. S. C. App. § 632.

4

On November 19, 1943, a board of appraisers appointed
by the District Court, in accordance with Nebraska law,
reported that "the just compensation for the value of
the use of the premises taken by the United States of
America is the sum of $74,940.00 per annum . . . ."
The appraisers made no award of damages for the loss of
patrons, which they recognized to be probable, because at
that time the amount of the loss could not be appraised.
The Government and the Laundry both appealed the
appraisers' award, and the question of just compensa-
tion was tried to a jury in March of 1946. The jury
awarded an annual rental of $70,000—a total of $252,000
for the whole term—and $45,776.03 for damage to the
plant and machinery beyond ordinary wear and tear.
The rental award was intended to cover taxes, insurance,
normal depreciation, and a return on the value of the
Laundry's physical assets. Interest at the rate of 6 per
cent was added from November 22, 1942, the day on
which the Army took possession, on the amount due for
the period between that date and June 30, 1943, and on
the rental for each year thereafter from the beginning of
the year until paid. Interest on the sum awarded for
damage to the plant and machinery was adjudged to
run from the date of the verdict, since the plant had not
then been returned.

The Laundry appealed to the Court of Appeals for
the Eighth Circuit, assigning numerous errors in the ad-
mission and exclusion of testimony and in the instructions
to the jury. The Court of Appeals affirmed the District
Court, 166 F. 2d 856, and we granted the Laundry's peti-
tion for certiorari, 335 U. S. 807, because it raised novel
and serious questions in determining what is "just com-
pensation" under the Fifth Amendment.

These questions are not resolved by the familiar for-
mulas available for the conventional situations which
gave occasion for their adoption. As Mr. Justice Bran-

deis observed, "Value is a word of many meanings." *Southwestern Bell Telephone Co.* v. *Public Service Comm'n,* 262 U. S. 276, 310. For purposes of the compensation due under the Fifth Amendment, of course, only that "value" need be considered which is attached to "property," [2] but that only approaches by one step the problem of definition. The value of property springs from subjective needs and attitudes; its value to the owner may therefore differ widely from its value to the taker. Most things, however, have a general demand which gives them a value transferable from one owner to another. As opposed to such personal and variant standards as value to the particular owner whose property has been taken, this transferable value has an external validity which makes it a fair measure of public obligation to compensate the loss incurred by an owner as a result of the taking of his property for public use. In view, however, of the liability of all property to condemnation for the common good, loss to the owner of nontransferable values deriving from his unique need for property or idiosyncratic attachment to it, like loss due to an exercise of the police power, is properly treated as part of the burden of common citizenship. See *Omnia Commercial Co.* v. *United States,* 261 U. S. 502, 508–09. Because gain to the taker, on the other hand, may be wholly unrelated to the deprivation imposed upon the owner, it must also be rejected as a measure of public obligation to requite for that deprivation. *McGovern* v. *New York,* 229 U. S. 363; *United States ex rel. T. V. A.* v. *Powelson,* 319 U. S. 266.

The value compensable under the Fifth Amendment, therefore, is only that value which is capable of transfer from owner to owner and thus of exchange for some equivalent. Its measure is the amount of that equivalent.

---

[2] U. S. Const. Amend. V: ". . . nor shall private property be taken for public use, without just compensation."

But since a transfer brought about by eminent domain is not a voluntary exchange, this amount can be determined only by a guess, as well informed as possible, as to what the equivalent would probably have been had a voluntary exchange taken place. If exchanges of similar property have been frequent, the inference is strong that the equivalent arrived at by the haggling of the market would probably have been offered and accepted, and it is thus that the "market price" becomes so important a standard of reference.[3] But when the property is of a kind seldom exchanged, it has no "market price," and then recourse must be had to other means of ascertaining value, including even value to the owner as indicative of value to other potential owners enjoying the same rights. Cf. *Old South Association* v. *Boston,* 212 Mass. 299, 99 N. E. 235. These considerations have special relevance where "property" is "taken" not in fee but for an indeterminate period.

Approaching thus the question of compensation for the temporary taking of petitioner's land, plant, and equipment, we believe that the award made by the District Court was correct. Petitioner insists, however, that the measure of compensation for a temporary taking

---

[3] Once taken, of course, property can have no actual market value except as giving rise to a claim against the taker. See 1 Bonbright, The Valuation of Property 414 (1937). In view of the resulting necessity of postulating a hypothetical sale, care must be taken to avoid the extremes, on the one hand, of excluding the value of the property for special uses and, on the other, of supposing the hypothetical purchaser to have either the same idiosyncrasies as the owner (compare *L. R. Junction Ry.* v. *Woodruff,* 49 Ark. 381, 5 S. W. 792, with *Producers' Wood Preserving Co.* v. *Commissioners of Sewerage,* 227 Ky. 159, 12 S. W. 2d 292) or the same opportunities for use of the property as a taker armed with the power of eminent domain (see e. g., *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53; *McGovern* v. *New York,* 229 U. S. 363; *Olson* v. *United States,* 292 U. S. 246; *United States ex rel. T. V. A.* v. *Powelson,* 319 U. S. 266).

which should have been applied is the difference between the market value of the fee on the date of the taking and its market value on the date of its return. But it was known from the outset that this taking was to be temporary, and determination of the value of temporary occupancy can be approached only on the supposition that free bargaining between petitioner and a hypothetical lessee of that temporary interest would have taken place in the usual framework of such negotiations. We agree with both lower courts, therefore, that the proper measure of compensation is the rental that probably could have been obtained, and so this Court has held in the two recent cases dealing with temporary takings. *United States* v. *General Motors Corp.,* 323 U. S. 373; *United States* v. *Petty Motor Co.,* 327 U. S. 372. Indeed, if the difference between the market value of the fee on the date of taking and that on the date of return were taken to be the measure, there might frequently be situations in which the owner would receive no compensation whatever because the market value of the property had not decreased during the period of the taker's occupancy.

The courts below also awarded compensation to petitioner for damage to its machinery and equipment in excess of ordinary wear and tear, the award of rental having been adjusted to include an allowance for normal depreciation. The Government does not object to this award, but we think it appropriate to point out that we find it justified on the theory that such indemnity would be payable by an ordinary lessee, though not fixed in advance as part of his rent because not then capable of determination.

The petitioner makes numerous objections to the sufficiency of the evidence in support of the amounts fixed by the jury as the rental value of the physical property and as compensation for damage to the plant and equip-

ment in excess of ordinary wear and tear.   Suffice it to say that we find these awards adequately supported.

At the core of petitioner's claim that it has been denied just compensation is the contention that there should have been included in the award to it some allowance for diminution in the value of its business due to the destruction of its "trade routes."   The term "trade routes" serves as a general designation both for the lists of customers built up by solicitation over the years and for the continued hold of the Laundry upon their patronage.

At the trial petitioner offered to prove the value of the trade routes by testimony of an expert witness based on the gross receipts attributable to each class of customers, and the testimony of one of its officers was offered to show that this value had wholly disappeared during the three and one-half years of the Army's use of the plant.[4] It further offered to show the cost of building up the customer lists, which had not been capitalized but charged to expense, and losses which would be incurred after the resumption of operations while they were being rebuilt. The petitioner also attempted to introduce evidence of its gross and net income for the eighteen years preceding the taking, the amount of dividends paid, and the ratio of officers' salaries to capital stock and surplus, on the theory that this evidence would shed additional light on the value of the Laundry as a going business.   The trial court rejected these offers as not bearing upon the "fair market value or fair use value of the property taken" and instructed the jury that it should not consider diminution in the value of the business.   The Court of Appeals affirmed because, in its opinion, whatever may have been the loss in value of the business or the trade routes

---

[4] Although the theory upon which petitioner's various offers of proof were made was not always well defined, their import is clear enough to preclude rejecting them as meaningless.

brought about by the taking, "The Government did not take or intend to take, and obviously could not use, the Company's business, trade routes or customers." 166 F. 2d at 860.

The market value of land as a business site tends to be as high as the reasonably probable earnings of a business there situated would justify, and the value of specially adapted plant and machinery exceeds its value as scrap only on the assumption that it is income-producing. And income, in the case of a service industry, presupposes patronage. Since petitioner has been fully compensated for the value of its physical property, any separate value that its trade routes may have must therefore result from the contribution to the earning capacity of the business of greater skill in management and more effective solicitation of patronage than are commonly given to such a combination of land, plant, and equipment. The product of such contributions is an intangible which may be compendiously designated as "going-concern value," but this is a portmanteau phrase that needs unpacking.

Though compounded of many factors in addition to relations with customers, that element of going-concern value which is contributed by superior management may be transferable to the extent that it has a momentum likely to be felt even after a new owner and new management have succeeded to the business property. But because this momentum can be maintained only by the application of continued energy and skill, it would gradually spend itself if the effort and skill of the new management were not in its turn expended. See Paton, Advanced Accounting 427, 435 (1941). Only that exercise of managerial efficiency, however, which has contributed to the future profitability of the business will have a transferable momentum that may give it value to a potential purchaser; that which has had only the effect of increasing current income or reducing expenses of operation has spent

itself from year to year. The value contributed by the expenditure of money in soliciting patronage, although likewise of limited duration, differs from managerial efficiency in that it derives not merely from the contribution of personal qualities but from original investment or the plowing back of income. As such it may sometimes be more readily recognized as an asset of the business.[5] It is clear, at any rate, that the value of both these elements, in combination, must be regarded as identical with the value alleged to inhere in the trade routes.

Assuming, then, that petitioner's business may have going-concern value as defined above, the question arises whether the intangible character of such value alone precludes compensation for it. The answer is not far to seek. The value of all property, as we have already observed, is dependent upon and inseparable from individual needs and attitudes, and these, obviously, are intangible. As fixed by the market, value is no more than a summary expression of forecasts that the needs and attitudes which made up demand in the past will have their counterparts in the future. See *Ithaca Trust Co.* v. *United States,* 279 U. S. 151, 155; cf. 1 Bonbright, The Valuation of Property 222 (1937). The only distinction to be made, therefore, between the attitudes which generate going-concern value and those of which tangible property is compounded is as to the tenacity of the past's hold upon the future: in the case of the latter a forecast of future demand can usually be made with greater certainty, for it is more probable on the whole that people will continue to want particular goods or services than that they will continue to look to a particular supplier of them. It is more likely, in other words, that people will persist in wanting to have their laundry done than that

---

[5] Indeed, for tax purposes the Treasury may insist that such "deferred charges" be capitalized. See note 11, *post.*

they will keep on sending it to a particular laundry. But as the probability of continued patronage gains strength, this distinction becomes obliterated, and the intangible acquires a value to a potential purchaser no different from the value of the business' physical property. Since the Fifth Amendment requires compensation for the latter, the former, if shown to be present and to have been "taken," should also be compensable. As Mr. Justice Brandeis observed for the Court in *Galveston Elec. Co.* v. *Galveston,* 258 U. S. 388, 396, "In determining the value of a business as between buyer and seller, the goodwill and earning power due to effective organization are often more important elements than tangible property. Where the public acquires the business, compensation must be made for these, at least under some circumstances." See also *Des Moines Gas Co.* v. *Des Moines,* 238 U. S. 153, 165; *McCardle* v. *Indianapolis Water Co.,* 272 U. S. 400, 414.

What, then, are the circumstances under which the Fifth Amendment requires compensation for such an intangible? Not, indeed, those of the usual taking of fee title to business property, but the denial of compensation in such circumstances rests on a very concrete justification: the going-concern value has not been taken. Such are all the cases, most of them decided by State courts under constitutions with provisions comparable to the Fifth Amendment, in which only the physical property has been condemned, leaving the owner free to move his business to a new location. E. g., *Bothwell* v. *United States,* 254 U. S. 231; *Banner Milling Co.* v. *State of New York,* 240 N. Y. 533, 148 N. E. 668. In such a situation there is no more reason for a taker to pay for the business' going-concern value than there would be for a purchaser to pay for it who had not secured from his vendor a covenant to refrain from entering into competition with him. It is true that there may

be loss to the owner because of the difficulty of finding other premises suitably situated for the transfer of his good will, and that such loss, like the cost of moving, is denied compensation as consequential. See *Joslin Mfg. Co.* v. *Providence,* 262 U. S. 668, 676. But such value as the good will retains, the owner keeps, and the remainder dissipated by removal would not contribute to the value paid for by a transferee of the vacated premises, except perhaps to the extent that the prospect of its loss would induce the owner to hold out for a higher price for his land and building. Cf. *United States* v. *General Motors Corp.,* 323 U. S. 373, 383. When a condemnor has taken fee title to business property, there is reason for saying that the compensation due should not vary with the owner's good fortune or lack of it in finding premises suitable for the transference of going-concern value. In the usual case most of it can be transferred; in the remainder the amount of loss is so speculative that proof of it may justifiably be excluded. See *Sawyer* v. *Commonwealth,* 182 Mass. 245, 65 N. E. 52, per Holmes, C..J. By an extension of that reasoning the same result has been reached even upon the assumption that no other premises whatever were available. *Mitchell* v. *United States,* 267 U. S. 341.

The situation is otherwise, however, when the Government has condemned business property with the intention of carrying on the business, as where public-utility property has been taken over for continued operation by a governmental authority. If, in such a case, the taker acquires going-concern value, it must pay for it. *Omaha* v. *Omaha Water Co.,* 218 U. S. 180; see *Denver* v. *Denver Union Water Co.,* 246 U. S. 178, 191; Orgel, Valuation under The Law of Eminent Domain § 214 (1936), and cases there cited. Since a utility cannot ordinarily be operated profitably except as a monopoly, investment by the former owner of the utility in duplicating the con-

demned facilities could have no prospect of a profitable return. The taker has thus in effect assured itself of freedom from the former owner's competition. The owner retains nothing of the going-concern value that it formerly possessed; so far as control of that value is concerned, the taker fully occupies the owner's shoes.

But the public-utility cases plainly cannot be explained by the fact that the taker received the benefit of the utility's going-concern value. If benefit to the taker were made the measure of compensation, it would be difficult to justify higher compensation for farm land taken as a firing range than for swamp or sandy waste equally suited to the purpose. But see *Mitchell* v. *United States,* 267 U. S. 341, 344–45. It would be equally difficult to deny compensation for value to the taker in excess of value to the owner. But compare, e. g., *McGovern* v. *New York,* 229 U. S. 363; *United States ex rel. T. V. A.* v. *Powelson,* 319 U. S. 266. The rationale of the public-utility cases, as opposed to those in which circumstances have brought about a diminution of going-concern value although the owner remained free to transfer it, must therefore be that an exercise of the power of eminent domain which has the inevitable effect of depriving the owner of the going-concern value of his business is a compensable "taking" of property. See *United States* v. *General Motors Corp.,* 323 U. S. 373, 378; cf. *United States* v. *Causby,* 328 U. S. 256. If such a deprivation has occurred, the going-concern value of the business is at the Government's disposal whether or not it chooses to avail itself of it. Since what the owner had has transferable value, the situation is apt for the oft-quoted remark of Mr. Justice Holmes, "the question is what has the owner lost, not what has the taker gained." *Boston Chamber of Commerce* v. *Boston,* 217 U. S. 189, 195.

We think that the situation before us comes within this principle. The Government's temporary taking of the Laundry's premises could no more completely have appropriated the Laundry's opportunity to profit from its trade routes than if it had secured a promise from the Laundry that it would not for the duration of the Government's occupancy of the premises undertake to operate a laundry business anywhere else in the City of Omaha. The taking was from year to year; in the meantime the Laundry's investment remained bound up in the reversion of the property. Even if funds for the inauguration of a new business were obtainable otherwise than by the sale or liquidation of the old one, the Laundry would have been faced with the imminent prospect of finding itself with two laundry plants on its hands, both of which could hardly have been operated at a profit. There was nothing it could do, therefore, but wait. Besides, though trade routes may be capable of transfer independently of the physical property with which they have been associated, it is wholly beyond the realm of conjecture that they could have been sold from year to year or that the Laundry would have bound itself to give them up for a longer period when at any time its plant might be returned. It is equally farfetched, moreover, to suppose that they could have been transferred for a limited period and then recaptured.

It is arguable, to be sure, that since an equally suitable plant might conceivably have been available to the petitioner at reasonable terms for the same period as the Government's occupancy of its own plant, and since that would have enabled it to stay in business without loss of going-concern value, it is irrelevant that no such premises happened to be available, as it would have been irrelevant, under a strict application of *Mitchell* v. *United States*, 267 U. S. 341, had the Government taken the fee. When fee title to business property has been taken, how-

ever, it is fair on the whole that the amount of compensation payable should not include speculative losses consequent upon realization of the remote possibility that the owner will be unable to find a wholly suitable location for the transfer of going-concern value. But when the Government has taken the temporary use of such property, it would be unfair to deny compensation for a demonstrable loss of going-concern value upon the assumption that an even more remote possibility—the temporary transfer of going-concern value—might have been realized. The temporary interruption as opposed to the final severance of occupancy so greatly narrows the range of alternatives open to the condemnee that it substantially increases the condemnor's obligation to him. It is a difference in degree wide enough to require a difference in result. Compare *United States* v. *General Motors Corp.*, 323 U. S. 373, with *United States* v. *Petty Motor Co.*, 327 U. S. 372.[6]

---

[6] The line drawn in these two cases between inclusion of removal costs in compensation for a temporary taking of less than a lessee's full term and their exclusion where the whole term has been taken is likewise based on a recognition of a difference in the degree of restriction of the condemnee's opportunity to adjust himself to the taking. In *United States* v. *General Motors Corp.*, 323 U. S. at 382, the Court, comparing a temporary with a fee taking, observed: "It is altogether another matter when the Government does not take his entire interest, but by the form of its proceeding chops it into bits, of which it takes only what it wants, however few or minute, and leaves him holding the remainder, which may then be altogether useless to him, refusing to pay more than the 'market rental value' for the use of the chips so cut off. This is neither the 'taking' nor the 'just compensation' the Fifth Amendment contemplates." In *United States* v. *Petty Motor Co.*, 327 U. S. at 379, the Court said: "There is a fundamental difference between the taking of a part of a lease and the taking of the whole lease. That difference is that the lessee must return to the leasehold at the end of the Government's use or at least the responsibility for the period of the lease which is not taken rests upon the lessee. This was brought out in

We conclude, therefore, that since the Government for the period of its occupancy of petitioner's plant has for all practical purposes preempted the trade routes, it must pay compensation for whatever transferable value their temporary use may have had. The case must accordingly be remanded to the District Court to determine what that value, if any, was. In making that determination, the Court should consider any evidence which would have been likely to convince a potential purchaser as to the presence and amount of petitioner's going-concern value, for this, as we have pointed out, must be considered identical with the value alleged to inhere in the trade routes. Though we do not mean to foreclose the consideration of other types of evidence or the application of other techniques of appraisal, it may shed some light on the problem to indicate as briefly as possible the relevance of the evidence rejected at the trial to the determination of the presence and amount of this value.

One index of going-concern value offered by petitioner is the record of its past earnings. If they should be found to have been unusually high in proportion to investment in its physical property, that might have been a persuasive indication to an informed purchaser of the business that more than tangible factors were at work.[7]

---

the *General Motors* decision. Because of that continuing obligation in all takings of temporary occupancy of leaseholds, the value of the rights of the lessees which are taken may be affected by evidence of the cost of temporary removal."

[7] The Government argues that if petitioner's testimony as to the value of its physical property were accepted, it could have no going-concern value because its average net earnings for the five years preceding the taking were too low to establish any excess return. The alleged value was about $650,000, and the average annual earnings $39,375.39, a return on that value of about 6%. On the other hand, the Government's own expert witnesses respectively valued the physical property, after allowing depreciation, at $455,000 and $433,500, and on that basis the rate of return would be about 9%. It is not for

Such a purchaser might well have measured the value thus contributed by capitalizing, at a rate taking into account the element of risk [8] and the number of years during which these factors would probably have effect, the excess of the probable future return upon investment in the business over a return which would be adequate compensation for the risk of investment in it.[9] If the figure chosen as representing investment were

us, at any rate, to assume that 6% rather than 5% or some lower figure is the lowest that would compensate investment in the physical property.

[8] The importance of varying in accordance with varying risks the percentage at which income is capitalized to obtain business value has been emphasized by the Securities and Exchange Commission in computing value for purposes of § 77 B reorganizations. See Note, 55 Harv. L. Rev. 125, 133 (1941). See also Fisher, The Nature of Capital and Income, c. 16, "The Risk Element" (1906); Angell, Valuation Problems 14 (Practicing Law Institute, 1945).

[9] See Yang, Goodwill and Other Intangibles, cc. 5, 6 (1927); Simpson, *Goodwill* in 6 Encyc. Soc. Sci. 698, 699 (1931). For a systematic discussion of the steps involved in making such an estimate, see Accountants' Handbook 869 *et seq.* (Paton ed., 1944). It would be theoretically possible, of course, to arrive at the total value of the business not by adding going-concern value obtained by capitalization of excess income to a valuation of the physical property obtained in some other way, but by capitalization of all income. See 1 Bonbright, The Valuation of Property, cc. 11, 12; (1937); 1 Dewing, Financial Policy of Corporations, Bk. II, c. 1 (4th ed., 1941); cf. *Consolidated Rock Products Co.* v. *Du Bois*, 312 U. S. 510, 525–26; *Institutional Investors* v. *Chicago, M., St. P. & P. R. Co.*, 318 U. S. 523, 540–42. But a forecast of future earnings is subject to inaccuracy resulting both from the difficulty of discounting the non-recurrent circumstances which entered into the record of past earnings upon which the forecast is based (even if no projection of future earnings is expressly made, past earnings can be used as a basis of capitalization only on the assumption that they will continue) and the hazards of any prediction of future conditions of business. See May, *A Footnote on Value*, 72 J. of Accountancy 225 (1941); Orgel, Valuation under The Law of Eminent Domain § 216 (1936). The consequences of inaccuracy are reduced by confining the capitalization to excess income, but of course it is a question of fact whether

cost, however, the possibility would probably have been recognized that the capitalized value of the excess income might involve duplication of value already reflected in the valuation of the site.[10]

In addition to or as a substitute for net income as an index of going-concern value, a purchaser might have been influenced by such evidence of expenditure upon building up the business as petitioner's records of payments to deliverymen for the solicitation of new customers. Instead of beginning with excess earnings resulting in part from expenditure on solicitation and then capitalizing them to reach going-concern value, such expenditure can be regarded as a direct contribution, in proportion to the amount of its long-term effectiveness, to the capital assets of the business. But the legitimacy of the inference that expenditures for the purpose of soliciting business have resulted in a value which will continue to contribute to the earning capacity of the business in later years and which is therefore a value that a purchaser might pay for, necessarily depends on the character of the business and the experience of those who are familiar with it.[11] This, at any rate, is a matter which is open to proof.

---

future excess income can be predicted with certainty sufficient to persuade a purchaser of the business to pay for its capitalized value. See pp. 19–20, *post*.

[10] This possibility would arise wherever cost of the physical property, because the neighborhood was undeveloped at the time the business site was acquired or for some other reason, did not wholly reflect enhancement in its market value by the advantages of its location, since these advantages would increase total income. Such duplication could be avoided, however, by using as the measure of investment not cost but market value.

[11] In the case of a business like the laundry business which must entice patrons from already established competitors in an area confined by the range of delivery service, it may be that expenditure upon solicitation is regarded as a capital expenditure for part of a combination of income-producing assets quite as much as invest-

Though not capitalized and carried on the books, it is obvious that such an asset may be present even in a business losing money or at any rate not making enough to have any "excess" income. A relevant measure of its value, however, would be the gross income of the business, as is recognized by the method of estimating going-concern value that has been employed in cases dealing with the excess-profits tax base of laundry businesses. See *Metropolitan Laundry Co.*, 2 B. T. A. 1062; *Pioneer Laundry Co.*, 5 B. T. A. 821. Petitioner offered proof of the value of its trade routes based on just such a method and further offered to show that it was a method generally used in the laundry business. If so, it would also be relevant.[12]

But even though evidence in one or more of these categories may tend to establish the value of petitioner's

---

ment in the land and building. Compare *Houston Natural Gas Corp.* v. *Commissioner*, 90 F. 2d 814 (C. A. 4th Cir.), holding the salaries and expenses of solicitors of new customers for a public utility to be a capital expenditure nondeductible from current income because contributing to income in future years. The Tax Court, its predecessor, the Board of Tax Appeals, and the Courts of Appeals have frequently held such analogous expenditures as those made to increase the circulation of newspapers and for certain forms of advertising to be capital expenditures. For collections of such cases, see 4 Mertens, Law of Federal Income Taxation § 25.18 and § 25.27 (1942). See also Dodd and Baker, Cases and Materials on Business Associations 1125–26 (1940). Compare the materials on valuation of good will as part of a decedent's gross estate collected in 2 Paul, Federal Estate and Gift Taxation § 18.16 (1942), and Paul, Federal Estate and Gift Taxation § 18.16 (1946 Supplement).

[12] Proceeding from the assumption that laundry businesses are a class having uniform characteristics, this method presupposes informed opinion both as to the normal ratio of a given volume of expenditure on solicitation to a given volume of gross income and as to the normal duration of the contribution to gross of a given amount of such expenditure. The Board of Tax Appeals cases cited as well as petitioner's offer of proof involved the further refinement that the ratios chosen varied with the gross income attributable to each class of customers.

trade routes, the consequence of its inadequacy may require complete denial of compensation where that would not be the result in the case of its tangible property. The reason is this: evidence which is needed only to fix the amount of the value of the tangible property is required to establish the very existence of an intangible value as well as its amount. Since land and buildings are assumed to have some transferable value, when a claimant for just compensation for their taking proves that he was their owner, that proof is *ipso facto* proof that he is entitled to some compensation. The claimant of compensation for an intangible, on the other hand, who cannot demonstrate a value that a purchaser would pay for has failed to sustain his burden of proving that he is entitled to any compensation whatever. This is a burden, moreover, which must be sustained by solid evidence; only thus can the probability of future demand be shown to approximate that for tangible property. Particularly is this true where these issues are to be left for jury determination, for juries should not be given sophistical and abstruse formulas as the basis for their findings nor be left to apply even sensible formulas to factors that are too elusive.

If the District Court, bearing in mind these cautions, should find petitioner's evidence adequate to submit to the jury for a finding as to the presence and amount of the value of the trade routes, it will then be necessary also to instruct it as to computation of the compensation due. Consistently with an approach which seeks with the aid of all relevant data to find an amount representing value to any normally situated owner or purchaser of the interests taken, no value greater than the value of their temporary control would be compensable. Since, as we have noted, value of this sort can have only a limited duration, the value of the trade routes for the period of the Army's occupancy of the physical property might be estimated by computing the discounted

value as of the beginning of the period of the net contribution likely to have been made to the business during that period had it been carried on; its value for each year would be the net contribution for that year.[13] But here, as hitherto, we mean only to illustrate and not to prescribe the course which may be taken upon remand of the case.

Petitioner also protests against the basis chosen by the lower courts for the award of interest. It argues that the Government, having taken the whole property on November 21, 1942, should pay interest from that day on the total amount of the award. We have already rejected, however, the only possible theory upon which this claim could rest—that the proper method of computing the award is to determine the difference between the value of the business on the date of taking and its value on the date of return. It follows from our holding that the proper measure of compensation was an annual rental which came due only at the beginning of each renewal of the Army's occupancy, that interest should be payable on each installment of rental only from that date.

For proceedings not inconsistent with this opinion, the case is

*Reversed and remanded.*

MR. JUSTICE RUTLEDGE, concurring.

As I understand the opinion of the Court, its effect is simply to recognize that short-term takings of property entail considerations not present where complete title has

---

[13] That contribution would not of course continue from year to year in a straight line, though it may prove more convenient to treat it as if it did. The analysis of compound-interest methods of depreciation accounting in Paton, Advanced Accounting, c. 12 (1941), gives insight into ways in which the rate of decline in the value of such an intangible might be computed. See also *id.* at 435; Canning, The Economics of Accountancy, cc. 13, 14 (1929); Yang, Goodwill and Other Intangibles, 201 *et seq.* (1927).

been taken. Rules developed for the simple situation in which all the owner's interests in the property have been irrevocably severed should not be forced to fit the more complex consequences of a piecemeal taking of successive short-term interests. Such takings may involve compensable elements that in the nature of things are not present where the whole is taken.

With this much I agree. But having recognized the possible compensability of intangible interests, I would not subscribe to a formulation of theoretical rules defining their nature or prescribing their measurement. What seems theoretically sound may prove unworkable for judicial administration. But I do not understand the opinion of the Court to do more than indicate possible approaches to the compensation of such interests. Since remand of the case will permit the empirical testing of these approaches, I join in the Court's opinion.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACK and MR. JUSTICE REED concur, dissenting.

The United States took this plant in order to run a laundry for the Army, not for the public. The trade-routes were wholly useless to it. It never used them. Yet it is forced to pay for them under a new constitutional doctrine that is forged for this case.

Heretofore it was settled that the owner could not receive compensation under the Fifth Amendment for the destruction of a business which resulted from the taking of his physical property, even though the business could not be reestablished elsewhere. *Mitchell* v. *United States,* 267 U. S. 341; *Bothwell* v. *United States,* 254 U. S. 231. That result followed from the rule that consequential damages resulting from the taking were not compensable. See *United States ex rel. T. V. A.* v. *Powelson,* 319 U. S. 266, 281–283; *United States* v. *Petty Motor Co.,* 327 U. S. 372, 377–378.

And so in this case if the United States had taken this plant for a *permanent* laundry to run for the Army and not for the public[1] it need not pay for the trade-routes. As Justice Brandeis said in *Mitchell* v. *United States, supra,* p. 345, "If the business was destroyed, the destruction was an unintended incident of the taking of land." As much seems to be conceded by the Court in the present case. That concession is necessary if precedent is to control. For in *United States* v. *General Motors,* 323 U. S. 373, 383, we said that a *temporary* taking and a *permanent* taking were to be treated alike in that respect. In that case the cost of moving out and preparing the space for the new occupancy was allowed insofar as it bore on the market value of the temporary occupancy. But we ruled that "proof of value peculiar to the respondent, or the value of good-will or of injury to the business of the respondent" must in that case "as in the case of the condemnation of a fee," be excluded from the reckoning, p. 383. The Court today repudiates that ruling when it holds that the United States must pay for the trade-routes of petitioner when its taking of the laundry was only *temporary.* There would be a complete destruction of the trade-routes if the taking of the plant were *permanent* and a depreciation of them (I assume) where it is *temporary.* Why the latter is compensable when the former is not is a mystery. Even the academic dissertation on valuation which the opinion imports into the Fifth Amendment from accounting literature conceals the answer.

The truth of the matter is that the United States is being forced to pay not for what it gets but for what the owner loses. The value of trade-routes represents the patronage of the customers of the laundry. Petitioner,

---

[1] As respects payment for the going-concern value when the government takes over a business to run it as such, see *Omaha* v. *Omaha Water Co.,* 218 U. S. 180, 202–203.

I assume, lost some of them as a result of the government's temporary taking of the laundry. But the government did not take them. There was indeed no possible way in which it could have used them. Hence the doctrine that makes the United States pay for them is new and startling. It promises swollen awards which Congress in its generosity might permit but which it has never been assumed the Constitution compels.

Petitioner has received all that it is entitled to under the Constitution. It has obtained after three years and seven months of use of its plant by the United States a sum of money equal to almost half the market value of the fee. That award was based on the market rental value of the plant [2] plus an allowance to restore the property to its original condition.[3] Under the authorities that award cannot be increased unless we are to sit as a Committee on Claims of the Congress and award consequential damages.

---

[2] That is the measure of compensation for the taking of a temporary interest in property. *United States* v. *General Motors Corp.*, 323 U. S. 373, 382; *United States* v. *Petty Motor Co.*, 327 U. S. 372, 378.

[3] Compensation for ordinary wear and tear is included in fixing the market rental value of the property. But wear and tear above that amount is separately compensable. See *In re Condemnation of Lands*, 250 F. 314, 315; *United States* v. *Certain Parcels of Land*, 55 F. Supp. 257, 263; *United States* v. *5,901.77 Acres of Land*, 65 F. Supp. 454; *United States* v. *14.4756 Acres of Land*, 71 F. Supp. 1005.