## UNITED STATES v. 12.75 ACRES OF LAND SITUATED IN SULLIVAN COUNTY, TENN., et al.

### No. 248.

United States District Court
E. D. Tennessee, Northeastern Division.
Jan. 11, 1951.

Otto T. Ault, U. S. Dist. Atty., Chattanooga, Tenn., Ferdinand Powell, Jr., Asst. U. S. Dist. Atty., for petitioner.

Charles C. Moore, Chattanooga, Tenn., Ernest F. Smith, Penn, Hunter, Smith, & Davis, Kingsport, Tenn., for defendants.

ROBERT L. TAYLOR, District Judge.

This is a proceeding in the exercise by the Government of its power of eminent domain whereby was taken a tract of land on which was located a quantity of sand, the property here in litigation. Following the first trial and a partial retrial, this Court entered an award based upon the replacement value of the sand. The Court of Appeals reversed and remanded the cause

for a new trial on the ground that "the judgment rendered in the district court is not grounded upon a sufficient recognition of the rule that the determination of market value, where the property taken has a market value, must be applied in the adjudication of just compensation for land taken by the United States by right of eminent domain." United States v. Pennsylvania-Dixie Cement Corporation, 6 Cir., 178 F.2d 195, 200. Over objection by the Government, the Cement Corporation has been permitted to amend its answer in order to aver that the deposit of sand had no market value but had a use value to the Cement Corporation of $1.50 per ton, delivered at its cement mill.

The Court of Appeals also observed in its opinion: "Viewing the evidence in entirety, it appears to us that the case was not tried on either side, or by the district judge, in such manner as to present a satisfactory record as to market value." In order to meet the situation there pointed out, the parties have stipulated most of the facts, as follows:

"I. That the document next below set forth is true and genuine and in all respects what it purports to be:

" 'This Agreement made this 24th day of June, 1940, by and between Brick Realty Corporation, a Delaware Corporation authorized to do business in the State of Tennessee, hereinafter called "First Party"; and Pennsylvania-Dixie Cement Corporation, a Delaware Corporation authorized to do business in the State of Tennessee, hereinafter called "Second Party."

" 'Witnesseth:

" 'That for and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt of all of which is hereby acknowledged, First Party hereby grants to Second Party, the right, for and during the period of ten (10) years from the date hereof, to enter upon the tract of land hereinafter described and to remove therefrom sand in such quantities as Second Party may desire.

" 'The tract of land upon which said rights are granted is situate in Sullivan County, Tennessee, lying between Cherokee Substation and Holston River, and is more particularly described as follows:

" 'Beginning at a point in the middle of an old road distant south fifty degrees twenty-two minutes west (50 deg. 22') one hundred sixty-five (165.00) feet from the southwest corner post of the property of the Cherokee substation; thence by a deflection angle of no degrees thirty-seven minutes (0 deg. 37') to the left fifty-six and seventy-five hundredths (56.75) feet to a point; thence by an interior angle of ninety degrees no minutes (90 deg. 00') and south forty degrees fifteen minutes east (40 deg. 15') one thousand one hundred and fifty (1,150.00) feet to a point; thence by a deflection angle of ninety degrees (90 deg. 00') to the left one hundred thirteen and five tenths (113.50) feet to a point; thence by a deflection angle of ninety degrees to the left one thousand one hundred and fifty (1,150.00) feet to a point; thence by a deflection angle of ninety degrees to the left fifty-six and seventy-five hundredths (56.75) feet to the point of Beginning, containing three acres, more or less.

" 'The rights of Second Party hereunder shall be exclusive in the sense that First Party will not grant to anyone else the privilege of removing sand from said tract of land during the period hereof, but First Party reserves to itself, its successors and assigns, the right during said period to go upon and use said tract of land for any purpose it may desire, but without unreasonable interference with the rights of said Second Party hereunder.

" 'In Witness Whereof, the said Brick Realty Corporation has caused these presents to be executed in its corporate name and on its behalf by its President, and its corporate seal to be hereunto affixed, attested by its Secretary, this the day and year first above written.

" 'Brick Realty Corporation,
by (signed) J. Fred Johnson,
President.

" 'Attest:
(Signed) Glen Bruce
Secretary.'

"II. That each of the following statements is true:

"1. That for about thirty years prior to the time of the condemnation of the lands described in the record in this case as Tract No. A–5, the Cement Corporation had been and was then the owner of and engaged in the business of operating a large cement mill and works for the manufacture of Portland Cement in Kingsport, Tennessee.

"2. That on June 24, 1940, and at the time of the execution and delivery of the document hereinbefore set forth, the Brick Realty Corporation named and described in said document, being seized as tenant in severalty in fee simple of Tract No. A–5, executed and delivered the document hereinbefore set forth.

"3. That the tract of land described by metes and bounds in the document hereinbefore set forth is a member, part and parcel of Tract No. A–5.

"4. That the only interest in or claim to Tract No. A–5 which the Cement Corporation had, at the time Tract No. A–5 was condemned and taken by the Government, in and to Tract No. A–5 was such interest in or claim to Tract No. A–5 as was passed to and vested in the Cement Corporation under, by virtue of or as a result of the document hereinbefore set forth.

"5. That the tract of land described by metes and bounds in the document hereinbefore set forth was located about one-half of a mile from the cement mill of the Cement Corporation in Kingsport, Tennessee.

"6. That the tract of land described by metes and bounds in the document hereinbefore set forth contained a deposit of sand which had substantial silica content rendering it suitable and usable in the manufacture of Portland Cement, but which was contaminated with dirt and other organic matter to such an extent that it was not suitable in brick work, plastering, concrete work or any other use except the manufacture of Portland Cement.

"7. That between June 24, 1940 and the time the Government condemned Tract No. A–5 in the latter part of 1942, the Cement Corporation removed from the deposit of sand in the tract of land described by metes and bounds in said document, 12,724 tons of sand for use in its cement mill in the manufacture of Portland Cement.

"8. That at the time the Government condemned Tract No. A–5 in the latter part of 1942, there remained in the deposit of sand on the tract described by metes and bounds in the document hereinbefore set forth 12,313 tons of sand.

"9. That during the period of time from June 24, 1940, until the Government condemned Tract No. A–5 in the latter part of 1942, the cost and expense to the Cement Corporation of excavating, removing and hauling to its cement mill in Kingsport, Tennessee, of sand from the deposit of sand on the tract of land described by metes and bounds in the document hereinbefore set forth was 34.85 cents per ton.

"10. That within twelve months after the Government condemned and took Tract No. A–5 the Cement Corporation purchased and used more than 12,313 tons of sand in the manufacture of Portland Cement at its cement mill in Kingsport, Tennessee.

"11. That in order to supply the Cement Corporation's demand and requirement within the twelve months after the Government took and condemned Tract No. A–5 in the latter part of 1942 for sand the Cement Corporation purchased more than 12,313 tons of sand at a price of $1.50 per ton delivered to its cement mill in Kingsport, Tennessee, which was the lowest price obtainable.

"12. That at the time the Government took and condemned Tract No. A–5 the sand in the deposit on the tract of land described by metes and bounds in the document hereinbefore set forth was not suitable or demanded for use in Kingsport, Tennessee, or elsewhere within a reasonable transportation radius so as to give it value as sand, and could not have been sold or otherwise disposed of by the Cement Corporation to any other person or persons and had no fair cash market value.

"13. That at the time the Government took and condemned Tract No. A–5 in the latter part of 1942, there were large quantities greatly exceeding 12,313 tons of sand of high silica content but so contaminated with dirt and other organic matter as not to

be suitable or demanded for use in brick work, plastering, concrete work or any other use in Kingsport, Tennessee, or that vicinity, in the general neighborhood of the Cement Corporation's cement mill which were for sale and could have been sold and purchased by the Cement Corporation and others at and for the price of 35 cents per ton, but such quantities of sand were so remotely located from the Cement Corporation's mill that the cost of hauling by truck from their locations plus the price paid therefor would have been greater than $1.50 per ton.

"14. That at the time the Government condemned Tract No. A–5 in the latter part of 1942, there was no manufacturer of Portland Cement, except the Cement Corporation, within a 75-mile radius of the location of Tract No. A–5 and the haulage cost of sand removed from the tract described by metes and bounds in the document hereinbefore set forth to the location of any such other cement mill would have been greater than the price which sand could have been bought by such other cement mill in its own location.

"15. That after the time the Government took and acquired Tract No. A–5 in the latter part of 1942, the Cement Corporation has continued to operate its cement mill in Kingsport, Tennessee, and had demanded and used in its operation large quantities of sand.

"16. That the Brick Realty Corporation has heretofore been fully paid and compensated for all of its interest in and claim to Tract No. A–5 condemned by the Government in the latter part of 1942."

In the course of the trial of the case the Cement Corporation introduced evidence, from which the Court finds this additional fact: That the sand taken by the Government and the sand bought by the Cement Corporation in its continued operations were of comparable quality, any superiority existing being in favor of the sand that was taken.

The Government objected to admission of the agreement included in the stipulations, on the ground that it was not an exclusive license or lease and passed no compensable interest to the Cement Corporation. Objection was also made to the stipulation as to the quantity of sand bought by the Cement Corporation and as to the price paid therefor. Both objections were overruled. The Government then moved for judgment that the Cement Corporation owned no compensable interest or, in the alternative, that the Cement Corporation be awarded nominal damages. The Cement Corporation moved for judgment in its favor for $1.50 per ton for the unremoved sand, less the cost of delivering the sand to its mill.

In the Cement Corporation's view of the matter, the Court of Appeals has foreclosed the question of compensable interest by holding that the Cement Corporation owned "the exclusive right for a period of ten years to enter upon a described three acres of the land and to remove therefrom sand in such quantities as it might desire", [178 F.2d 196] and by remanding the case for trial on the question of value. This Court is inclined to agree with the Cement Corporation's view. However, as the Government has made its motion and it is not certain that the matter has been foreclosed, the Court now states its opinion that the motion and the alternative motion should be overruled.

■ ▇▇▇ It is implicit in decisions of the Supreme Court that whether a person owns a compensable interest or right is to be determined by local law, while the measure of compensation is to be determined by federal standards. United States v. Gerlach Live Stock Co., 339 U.S. 725, 70 S.Ct. 955; United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; United States v. Petty Motor Co., 327 U.S. 372, 380, 66 S.Ct. 596, 90 L.Ed. 729. In Tennessee, a right to remove minerals from land is recognized as a valuable property right. If it is an exclusive right, it is said to be a corporeal hereditament—an interest in land. Bates v. Georgia Fertilizer Co., 144 Tenn. 32, 46, 229 S.W. 153. If it is a right enjoyed in common with the owner of the fee, it is an incorporeal hereditament. The chief difference between the two is that the one can be conveyed by its owner to more than one grantee to be enjoyed by them separately, while the other—the incorporeal here-

ditament—cannot be split among several grantees. Stanton v. T. L. Herbert & Sons, 141 Tenn. 440, 211 S.W. 353. Both are assignable, and both are valuable, though it is apparent there could be a material difference in the extent of value.

Here, however, the language of the agreement suggests an intention to convey in effect, if not in fact, an exclusive right to remove sand. It is stipulated that Brick Realty Company has been compensated for the taking of the fee, and the record discloses no claim on the part of Brick Realty Company to any part of the compensation to be awarded for the sand. As the two corporations have treated the agreement as the transfer of an exclusive right, the Court should so treat it. Canton Cotton Mills v. Bowman Overall Co., 149 Tenn. 18, 29, 257 S.W. 398.

In stipulating that there was no market for the sand, the parties obviously meant that there was no market for this exclusive right to remove the sand, for which reason the removal right had no market value. This is of some importance in that it excludes any consideration of the value of the sand in place, and emphasizes the value of the removal right and of the removed sand. The stipulations also exclude consideration of any assignment value the removal right may have had and so eliminate one of the methods of determining just compensation. See, Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 123, 44 S.Ct. 471, 68 L.Ed. 934. In the petition for condemnation the value of the fee and that of the sand removal right were not separately estimated. Ordinarily it is required that the condition of the title be taken into consideration in arriving at the value of a particular interest. McGovern v. City of New York, 229 U.S. 363, 372, 33 S.Ct. 876, 57 L.Ed. 1228. Separately appraised, the easement or the improvement may prove to be of much greater value than the dominant estate. Boston Chamber of Commerce v. Boston, 217 U.S. 189, 30 S.Ct. 459, 54 L.Ed. 725; Southern Ry. Co. v. City of Memphis, 126 Tenn. 267, 148 S.W. 662, 41 L.R.A., N.S., 828. Here the right to remove sand, regarded as a separate interest, had no market value. Had it been owned by a third party at the time of the condemnation, it would have had a likely market, namely, the Cement Corporation. But as the situation stood, the Cement Corporation was the market for its own sand. It is the Government's theory that special value of property to the owner may not be considered and that, since the sand had no market value in the accepted sense, the Government can be liable for no more than nominal damages. It would seem analogous to the uncompensated taking of the beef supply of a family of meat-eaters, who live in a society of vegetarians.

"It is usually said that market value is what a willing buyer would pay in cash to a willing seller." United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336. See, also, Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 123, 44 S.Ct. 471, 68 L.Ed. 934; Karlson v. United States, 8 Cir., 82 F.2d 330, 337; Lebanon & Nashville Turnpike Co. v. Creveling, 159 Tenn. 147, 17 S.W.2d 22, 65 A.L.R. 440. It is sometimes called the transfer value of property. Kimball Laundry Co. v. United States, 338 U.S. 1, 5, 69 S.Ct. 1434, 93 L.Ed. 1765. The market value concept was adopted as a practical standard for measuring just compensation. United States v. Miller, 317 U.S. 369, 373, 63 S.Ct. 276, 87 L.Ed. 336. Its efficacy presupposes a commercial community wherein property of the kind is bought and sold. United States v. New River Collieries, 262 U.S. 341, 345, 43 S.Ct. 565, 67 L.Ed. 1014. As a guide in other situations, its way is confused and tortuous. "Perhaps no warning has been more repeated than that the determination of value cannot be reduced to inexorable rules." United States v. Toronto, Hamilton & Buffalo Navigation Co., 338 U.S. 396, 402, 70 S.Ct. 217, 221. "The Court in its construction of the constitutional provision has been careful not to reduce the concept of 'just compensation' to a formula. * * * The Court in an endeavor to find working rules that will do substantial justice has adopted practical standards, including that of market value. United States v. Miller, 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336. But it has refused to make a fetish even of

market value, since that may not be the best measure of value in some cases." United States v. Cors, 337 U.S. 325, 332, 69 S.Ct. 1086, 1090, 93 L.Ed. 1392.

Hence the market value rule is applied with variations, sometimes not at all. The market contemplated is a free, open market. Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 123, 44 S.Ct. 471, 68 L.Ed. 934; L. Vogelstein & Co. v. United States, 262 U.S. 337, 340, 43 S.Ct. 564, 67 L.Ed. 1012. Where the market price is artificially imposed, it is just compensation only if it represents the true market value. United States v. Commodities Trading Corporation, 339 U.S. 121, 123, 70 S.Ct. 547; United States v. John J. Felin & Co., Inc., 334 U.S. 624, 631, 642, 68 S.Ct. 1238, 92 L. Ed. 1614. The sovereign has consistently disclaimed liability for consequential damages caused by a taking. Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463; McGovern v. City of New York, 229 U.S. 363, 372, 33 S.Ct. 876, 57 L.Ed. 1228; Mitchell v. United States, 267 U.S. 341, 344, 345, 45 S.Ct. 293, 69 L.Ed. 644; United States ex rel. T. V. A. v. Powelson, 319 U.S. 266, 275, 281–282, 63 S.Ct. 1047, 87 L.Ed. 1390; United States v. General Motors Corporation, 323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311. Yet this exclusion is justified largely on grounds of remoteness, and where consequential damages are an ingredient of market price or market value they are compensable. United States v. General Motors Corp., 323 U.S. 373, 383, 65 S.Ct. 357, 89 L.Ed. 311; United States v. John J. Felin & Co., Inc., 334 U.S. 624, 642, 68 S.Ct. 1238, 92 L.Ed. 1614. In some situations a property owner is denied the market value, even where there is an easily provable market value, as where an increment of the value springs from the project which necessitated the taking. United States v. Cors, 337 U.S. 325, 332, 69 S.Ct. 1086, 93 L.Ed. 1392; United States v. Miller, 317 U.S. 369, 376–377, 63 S.Ct. 276, 87 L.Ed. 336. Again, the market value rule has been applied not to that which was taken, but to that which was left, which amounts to a rejection of the rule as originally conceived. United States v. Grizzard, 219 U.S. 180, 184, 31 S.Ct. 162, 55 L.Ed. 165; Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L. Ed. 1236. And this before and after rule, applicable to imposition of easements, is in turn rejected when sought to be applied to the taking of a short-term lease. Kimball Laundry Co. v. United States, 338 U.S. 1, 7, 69 S.Ct. 1434, 93 L.Ed. 1765. The before and after rule, while inconsistent with the market value rule, is equally at odds with the rule against allowance of consequential damages. While special value to the owner is regarded as not compensable, this is distinguished from the special adaptability of the property, which is compensable. Boom Co. v. Patterson, 8 Otto 403, 98 U.S. 403, 408, 25 L.Ed. 206; Olson v. United States, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236; Mitchell v. United States, 267 U.S. 341, 344–345, 45 S.Ct. 293, 69 L.Ed. 644; United States ex rel. T. V. A. v. Powelson, 319 U.S. 266, 275, 63 S. Ct. 1047, 87 L.Ed. 1390; United States v. Causby, 328 U.S. 256, 261, 66 S.Ct. 1062, 90 L.Ed. 1206. In some cases it is said that the just compensation requirement deals with persons and not with property. Southern California Fishermen's Ass'n v. United States, 9 Cir., 174 F.2d 739, 740. Again it is said, "For purposes of the compensation due under the Fifth Amendment, of course, only that 'value' need be considered which is attached to 'property,' * * *." Kimball Laundry Co. v. United States, 338 U.S. 1, 4, 69 S.Ct. 1434, 1437, 93 L.Ed. 1765. The Fifth Amendment forbids the taking of private property for public use, without just compensation. "The critical terms are 'property,' 'taken' and 'just compensation'". And property is a term here used "to denote the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it. * * * The constitutional provision is addressed to every sort of interest the citizen may possess." United States v. General Motors Corporation, 323 U.S. 373, 377–378, 65 S.Ct. 357, 359, 89 L.Ed. 311. And now it is said, "But when the property is of a kind seldom exchanged, it has no 'market price,' and then recourse must be had to other means of ascertaining val-

ue, *including even value to the owner as indicative of value to other potential owners enjoying the same rights.*" Kimball Laundry Co. v. United States, 338 U.S. 1, 6, 69 S.Ct. 1434, 1438, 93 L.Ed. 1765. (Emphasis supplied.)

In the present case the sand was not a thing of special, particular or peculiar value to the owner, as might have been true of an heirloom or some exotic article used in some exclusive trade or off-trail profession. It was one of the ordinary raw materials of a common industry, as necessary to the Cement Corporation as ore to an iron smelter, or coal to a steam plant. When the Government took its supply of sand, the Cement Corporation had to buy sand to replace it. The sand bought and the sand taken had substantially the same raw material value, worth as much to the Cement Corporation as it would have been worth to any other cement manufacturer that experienced a similar need.

 While market value is recognized as a convenient standard for measuring just compensation, it is only one standard and not an exclusive one. It becomes far-fetched when it is based upon a mere inquiry as to the local price, or even the price in a distant place, at which the property could have been sold. United States v. Toronto, Hamilton & Buffalo Navigation Co., 338 U.S. 396, 70 S.Ct. 217. Because of the "no-market" stipulation of this case, the market value standard could be applied only in a theoretical sense by finding what a prospective purchaser would pay for the sand, if there were a prospective purchaser. The Cement Corporation was a prospective purchaser of sand of comparable quality and quantity, but not of this sand for the reason that the Cement Corporation was its owner. In theory the sand had a monetary value, namely, the price the Cement Corporation paid for comparable sand. "At times, * * * peculiar circumstances may make it impossible to determine a 'market value.' * * * We then say that there is 'no market' for the property in question. * * * And it is here that other means of measuring value may have relevance—

but only, of course, as bearing on what a prospective purchaser would have paid." United States v. Toronto, Hamilton & Buffalo Navigation Co., 338 U.S. 396, 402, 70 S.Ct. 217, 221. That the market value concept is largely theoretical, because of the nature of the property as well as because it is not sold, but taken. It is not what one person, two persons, or even a hundred persons might be willing to pay for it; rather, it is what one person out of a hundred might be willing to pay for it. "The owner must be compensated for what is taken from him; but that is done when he is paid its fair market value for all available uses and purposes." United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 81, 33 S.Ct. 667, 679, 57 L.Ed. 1063. To the same effect is Boom Company v. Patterson, 8 Otto 403, 98 U.S. 403, 408, 25 L.Ed. 206: "The inquiry in such cases must be what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted; that is to say, what is it worth from its availability for valuable uses. Property is not to be deemed worthless because the owner allows it to go to waste, or to be regarded as valueless because he is unable to put it to any use. Others may be able to use it, and make it subserve the necessities or conveniences of life. Its capability of being made thus available gives it a market value which can be readily estimated."

 Basically market value is only a means to an end; it is not the end itself. The foundation requirement of just compensation is this: The owner of property taken by the Government is "entitled to the full money equivalent of the property taken," and he is entitled thereby "to be put in as good position pecuniarily as" he "would have occupied, if" his "property had not been taken." United States v. New River Collieries Co., 262 U.S. 341, 343, 43 S.Ct. 565, 567, 67 L.Ed. 1014. Such compensation as the Fifth Amendment requires is "the full and perfect equivalent in money of the property taken." United States v. Miller, 317 U.S. 369, 63 S.Ct. 276,

279, 87 L.Ed. 336. See, also, Seaboard Air Line Ry. Co. v. United States, 261 U. S. 299, 304, 43 S.Ct. 354, 67 L.Ed. 664; Monongahela Navigation Co. v. United States, 148 U.S. 312, 326, 13 S.Ct. 622, 37 L.Ed. 463. Here there is evidence that the Cement Corporation was not injured in its operations by the taking of the sand, that its value as a going concern was the same after as before the taking. This, however, is not a situation for application of the before and after rule for measuring decrease in market value due to an easement or a severance. The Cement Corporation continued as a going concern for the reason that it was able to·buy sand to replace that which was taken. Some objection was raised by the Government to the admission of evidence of the amount of sand purchased and the time within which it was purchased. This was on the ground that whether or not the Cement Corporation would have removed and used the sand taken by the Government was speculative. With this the Court disagrees. The Cement Corporation was a going concern; it had removed large quantities of sand, and there was a reasonable expectation that it would remove the remainder of the sand. The Court must find that the reason the Cement Corporation did not remove the rest of the sand was because the Government prevented its doing so. This was a deprivation that amounted to a taking of the sand. United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; United States v. General Motors Corporation, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311.

Since the market value standard as explained by the Court of Appeals cannot, because of the stipulations, be applied literally, the Court is forced by necessity to apply the broader rule of "full equivalent." In an earlier case the Circuit Court of Appeals for the Sixth Circuit said: "The constitutional phrase 'just compensation' means a full and perfect equivalent for the property taken. * * * Just compensation rests on equitable principles and means substantially that the owner should be put in as good position as he would have been if his·property had not been

taken or as nearly so as is possible under the given circumstances." Jefferson County, Tenn. v. Tennessee Valley Authority, 6 Cir., 146 F.2d 564, 565. It is sometimes called "the owner's loss" rule. "In enforcing this constitutional requirement 'the question is, What has the owner lost? not, What has the taker gained'". United States v. John J. Felin & Co., Inc., 334 U.S. 624, 630, 68 S.Ct. 1238, 1241, 92 L.Ed. 1614. "It is the owner's loss, not the taker's gain, which is the measure of the value of the property taken." United States v. Causby, 328 U.S. 256, 261, 66 S. Ct. 1062, 1065, 90 L.Ed. 1206. While loss of business opportunity and such consequential damages as are remote are not compensable, it is important here that the Cement Corporation is claiming compensation only for its direct loss. It claims to have lost no business opportunity; it does not seek to recover for consequential damages. It was deprived of property which had a monetary value, and it is that value which it seeks to be compensated for.

Replacement cost and the monetary loss involved in the replacement have been stipulated. This presents the answer as to what is just compensation, if it is acceptable. In some situations, restoration cost is the measure of just compensation, as where a county highway system has been destroyed. Jefferson County, Tenn. v. T. V. A., 6 Cir., 146 F.2d 564, 566; State of California v. United States, 9 Cir., 169 F.2d 914; United States v. Des Moines County, Iowa, 8 Cir., 148 F.2d 448, 160 A.L.R. 953. In the taking of a market property, the court said: "We are of opinion that the only just and legal method of arriving at the fair value of the property to be taken over by the government, under the provisions of the act, is to determine first the cost of reproduction based upon present values and deducting therefrom the amount of depreciation." In re U. S. Commission To Appraise Washington Market Company Property, 54 App. D.C. 129, 295 F. 950, 954–955. Consideration of reproduction cost was approved, also, in Albert Hanson Lumber Co., Ltd. v. United States, 261 U.S. 581, 589, 43 S.

Ct. 442, 67 L.Ed. 809. In his concurring opinion in United States v. John J. Felin & Co., Inc., 334 U.S. 624, 649, 68 S.Ct. 1238, 1250, 92 L.Ed. 1614, without citing cases Justice Rutledge said: "It is true that in circumstances where there is no market value, 'replacement cost' has been held appropriate for consideration in reaching a judgment concerning the value which is just compensation." In Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 125, 44 S.Ct. 471, 475, 68 L.Ed. 934, the court said: "This court has held in many cases that replacement cost is to be considered in the ascertainment of value," and cited Southwestern Bell Telephone Co. v. Public Service Commission, 262 U.S. 276, 287, 43 S.Ct. 544, 67 L.Ed. 981; Bluefield Water Works & Improvement Co. v. Public Service Commission, 262 U.S. 679, 689, 43 S.Ct. 675, 67 L.Ed. 1176; Georgia Ry. & Power Co. v. Railroad Commission, 262 U.S. 625, 629, 43 S. Ct. 680, 67 L.Ed. 1144. When the courts say that a certain element is to be considered, presumably they do not mean to say that it is to be considered and then discarded, but that it is to be accepted as in some measure a guide to value. There is nothing in the record here to show that replacement sand was bought at an inflationary price, or that it contained an increment due to the project which necessitated the taking of the Cement Corporation's sand. In the circumstances of this case, replacement cost is the only index to value that has the virtue of accuracy. It reflects the owner's loss without any of the objectionable appendages.

It is stipulated that the Cement Corporation was deprived of 12,313 tons of sand, that it could have made this sand available at its cement mill at a cost of 34.85 cents per ton, and that it paid for the replacement sand $1.50 per ton, delivered at its mill. The difference, $1.1515, was the owner's loss per ton. The total loss was $14,178.42, and this amount the Cement Corporation is entitled to recover. In addition thereto, and as a part of just compensation, the Cement Corporation is entitled to interest. As the parties have not stipulated as to the date of the taking

of the sand, the date of the filing of the declaration of taking, namely, November 20, 1944, will be the interest date. By statute, 40 U.S.C.A. § 258a, the Cement Corporation is entitled to 6% per annum from November 20, 1944, until the date of payment of the judgment. At the time of the filing of the declaration of taking, the sum of $6,820.00 was deposited in the registry of the court. Part of this sum has been accepted by Brick Realty Corporation as its share of compensation. Interest will, therefore, be computed on the net award, which will be found by deducting the unclaimed portion of the deposit from the $14,178.42.

Let an order of final judgment be prepared accordingly.