Fred A. Young, J.
The above-entitled claim for an appropriation was filed in the office of the Clerk of the Court of Claims and a copy thereof was served upon the Attorney-General on February 10, 1959. Prior thereto on September 3, 1958, the State of New York, pursuant to section 30 of the Highway Law, appropriated in fee four parcels of land totaling 10.185 acres from the claimant’s property located in the Town of Thompson, Sullivan County, New York for highway purposes, *393 by filing Map No. 105-R1, Parcels 244, 245, 446, 477 in the office of the County Clerk of Sullivan County, New York.
Thereafter, on October 1,1958, the State of New York further appropriated two temporary easements comprising 0.176 acres from the claimant’s land by filing Map No. 107, Parcels 246, 247 in the office of the County Clerk of Sullivan County, New York. We adopt the maps and descriptions of the appropriated property shown and set forth on such maps and reference is hereby made thereto for such description without repetition thereof.
At the time of the appropriation the claimant was the owner in fee of a tract of land comprising some 30.15 acres, most of which was cleared except for a portion of the southeasterly corner, which was wooded with brush on it. The land was well drained with the exception of a small area in the southeasterly portion. A small stream or brook ran through the northeasterly part of the land. In this area the claimant’s residence, as well as several farm buildings, hereinafter described, were located. On the north the property was fronted approximately 1,000 feet on Holmes Road and on the west for about 1,200 feet on former Route 17.
For several years prior to 1958 the claimant had operated an egg-producing farm upon the premises. At the time of the appropriation this farm was one of the largest, if not the largest enterprise of this sort, in New York State. Some 26,000 egg-laying chickens maintained on the farm had an annual production of 4,250,000 eggs. The plant was well furnished with modern, and for the most part, automatic equipment, adapted to servicing the egg-producing birds.
The tracts of land appropriated by' the State of New York from the claimant’s property are described as follows: Parcel 244 a triangular-shaped area 4,505 acres in extent located in the southwestern part of the property abutting old Route 17. This parcel was appropriated without the right of access. Parcel 446 a “ T ’’-shaped area was located approximately in the center of the claimant’s farm. This tract was 2.980 acres in area and was appropriated without the right of access. Parcel 245, a rectangular piece of land, located in the southeast portion of the claimant’s property, was 1.52 acres in area. Parcel 447, a rectangular piece of land, located in the north central part of the claimant’s property was 1.180 acres in area. These two later takings did not restrict the claimant’s access.
Parcel 244 was used for the construction of the “Quickway”. Parcels 245, 446 and 447 were used for a reconstruction and relocation of Route 17. The temporary easements, Parcels *394 246 and 247 were used for the removal of the only building located in the appropriated area, a structure hereinafter referred to as egg-production unit No. 6. The takings split the claimant’s farm up into three separate areas, designated upon the trial as Parcels A, B and C; Parcel A being 3.15 acres, Parcel B 4.8 acres and Parcel G 12 acres.
After the appropriation, Parcel A fronted 442 feet on relocated Boute 17. Parcel B fronted 442 feet on relocated Boute 17 and 190 feet on Holmes Boad. Parcel C had approximately 954 feet on relocated Boute 17, wherein access was not restricted. This parcel also fronted on Holmes Boad for approximately 651 feet. No change was made in Holmes Boad. However, the construction and relocation of Boute 17 was at a lower elevation, in certain areas, than the adjoining property; the grade difference in Parcel 245 being the maximum of about 12% feet, and the cut in Parcel 447 a maximum of 4% feet.
Both parties are in agreement that before the appropriation the best available use for the property was as an egg farm, and that such property was a well-integrated economic unit for the production of eggs.
The State contended that after the appropriation the farm remained a usable economic unit despite the fact that the elimination of building No. 6 reduced its capacity by 10,000 birds. The claimant on the other hand contended that the farm was no longer suitable for the purposes to which it was devoted before the appropriation and because of the takings there was no available place in which it would be feasible to construct another building to restore the former capacity of the farm. There was considerable controversy with respect to the advisability of constructing a new egg-production unit in close proximity to a road because of disease factors. However, despite the fact that the claimant’s real estate appraiser did not give a possible use for the farm after the appropriation, his after-value was approximately $11,000 less than that of the State’s appraiser. This difference is comparatively small when we consider the fact that there was a $225,000 difference in the appraisals of the same property, by the same experts, before the appropriation. Despite the vast difference in the before value, the experts are in agreement that the appropriation of the various parcels and building No. 6 greatly reduced the fair market value of the property. The appraisal figures of the claimant’s expert indicate a reduction of his original value by approximately 92%, the State’s expert 68%.
Hence, there is no question but that the appropriation reduced the market value of the farm to a great degree. However, it *395 still had a 16,000-bird capacity. It had formerly been successfully operated at a smaller capacity. In fact, the claimant had purchased it at a time when it was a considerably smaller operation. It is true that there was a tendency in the egg-production business toward a larger operation and some of the advantages of large operation accruing to this farm were lost. Moreover construction of new buildings and re-expansion of the farm after the appropriation presented problems and was a highly questionable proposition. Nevertheless after the appropriation the farm was still a well-integrated unit. All the remaining buildings necessary for the enterprise were located in Parcel C. The fact that the claimant ceased operations after the taking is not conclusive; furthermore, there was a demand for smaller egg farms. We have considered all the evidence and concluded that after the appropriation the best available use for the premises was as an egg-producing farm.
As we have indicated, the difference between the experts in the aftervalue of the premises is relatively small and presents no great problem. The main area of disparity between these witnesses is the value of the premises before the taking. There is no record of any sale of comparable property in the general area, which may serve as a competent guide to assessing the fair market value of the claimant’s property prior to the taking. Therefore upon the trial we allowed the parties considerable latitude in presenting facts which may possibly assist the court in the assessment of damages.
The claimant presented evidence showing that, after the appropriation reduced his production, he lost a valuable contract to supply eggs to a large grocery chain, and for the same reason lost an advantageous contract for the purchase of feed. While the contracts may be considered to show the farm was particularly adapted for egg production (Matter of City of Rochester [Smith St. Bridge], 234 App. Div. 583), the State did not appropriate the contract with either company (cf. Kimball Laundry Co. v. United States, 338 U. S. 1). The claimant cannot recover for their loss, nor can he be compensated for the loss of business (Humbert v. State of New York, 278 App. Div. 1041; Burdick v. State of New York, 276 App. Div. 1052, affd. 302 N. Y. 670; Matter of City of Rochester [Smith St. Bridge], supra; Mitchell v. United States, 267 U. S. 341), nor may we consider net profits (Banner Milling Co. v. State of New York, 240 N. Y. 533; Burdick v. State of New York, supra).
Certain parts of the Federal income tax reports filed by the claimant for several years prior to the appropriation were also introduced upon the trial and considerable time was devoted to *396 an explanation of such reports. Attempts also were made to prove what the potential income of such a farm would be. This latter evidence Avas accepted subject to being stricken out. Testimony by Mr. Norbeck to the effect that the operation should produce an income of $50,000 a year is stricken from the record; furthermore we have not considered the income tax reports of the claimant or the explanations thereof; net profit or loss or potential net profits are based upon the managerial ability of the operator and not the intrinsic value of the property. We have excluded such facts from our consideration.
In the final analysis, for his proof of value, the claimant relied on appraisals based on land value and structure value computed on the basis of reconstruction costs less depreciation or sound value. The State’s expert based his appraisal on his oavu opinion of what a ready and willing buyer would pay and he did not give much consideration to sound value.
Upon the trial the parties also called construction experts Avho testified to their opinion of the sound value of the structures.
Because the great difference in the appraisals is found only in the prior value, we believe an analysis of the testimony of these experts is in order.
Both real estate appraisers valued the land and buildings separately and then arrived at a total valuation. The claimant’s expert placed a different value per acre on each of the several parcels enumerated (supra), comprising the farm. In doing so he ascribed the smallest value to Parcel 0 wherein all buildings Avere located, except building No. 6, and attributed the highest value to appropriated Parcel No. 244 although such tract did not constitute a very important part of the claimant’s enterprise. He valued Parcel 0 at $1,000 per acre; this compares with the $750 per acre value for the entire tract placed by the State’s appraiser. We cannot accept the claimant’s expert’s explanation for his valuation of the parcels other than “ C ”, particularly in view of the fact he found the highest available use for the farm was an egg-producing plant. We have considered his land appraisal accordingly.
To prove the sound value of the buildings, i.e., reconstruction cost less depreciation thereof, the claimant called as his expert witness an engineer Avith eminent qualifications. On the other hand the State relied on the testimony of a local contractor. While there is vast difference in the testimony of these experts with respect to reconstruction costs, their percentage of depreciation does not vary too greatly. The claimant’s expert depreciated the various buildings from a minimum of 4% to a maximum of 36%, or a composite depreciation factor of 18%. The State’s *397 export depreciated his entire reconstruction cost by 20% to arrive at his opinion of sound value.
Before further consideration of the testimony of the construction experts we will describe the subject structures. Egg-production unit No. 6, which was appropriated by the State, was a three-story timber-framed structure with concrete flooring, and a timber and rock approach ramp; the floor area was 19,900 square feet in extent. It had been designed by the claimant, who was an accountant, and constructed in 1953 with local farm labor. The building was adequate, but it was not most skillfully built. It was adequately equipped with modern devices for housing and feeding the egg-producing chickens as were other egg-producing buildings comprising the claimant’s farm.
Egg-production unit No. 1 was a composite structure one part of which was a three-story cinder block structure, with timber-framed floors. The cinder block section was constructed in 1939 by a contractor. The former owner had installed the electrical and plumbing equipment himself. The claimant had placed certain insulation in the building and installed a new roof. The frame portion of the building was a converted frame dairy barn well over 30 years of age. The area was approximately 14,000 square feet in extent.
Egg-production unit No. 2 was also a composite structure. There was a two-story cinder block portion constructed in 1947 and 1948 by a contractor. The other portion was a two-story timber-framed structure constructed by a carpenter in 1942, plumbing and electrical work was done by the former owner. This latter portion had a basement with a heating plant, total area of the building was 6,800 square feet.
Egg-production unit No. 3 was a timber-framed single-story rectangular structure with about 3,600 square feet of space. The structure had been completed in 1950 by the former owner with the help of a carpenter.
Egg-production unit No. 4 was a two-story timber-framed rectangular structure. The first floor thereof in the main had a dirt floor with a concrete floor in the utility area at one end. The second floor was timber throughout. Approximately 6,800 square feet of space were available. It had been constructed and designed by the claimant in 1956.
Egg-production unit No. 5 was a single-story structure with a peaked aluminum roof, timber-framed, containing approximately 4,700 square feet of area. It had been constructed by the former owner of the farm, approximately seven or eight years before the appropriation.
*398 The main house was a timber-framed, two-story structure providing approximately 4,200 square feet of space, with a partial cellar, and an oil-fired steam and heating plant. It was upwards of 30 years old. It had been modified in a haphazard manner, but had been modernized to some extent and was in a fair state of repair. A single-story irregular structure, appended to the main house, constructed of concrete and timber, containing approximately 360 square feet, was referred to as the egg room.
The other structures on the premises consisted as follows: two single-story framed structures containing an aggregate 580 square feet and referred to as bungalows No. 1 and No. 2. These structures were used for Summer guests and to house farm help. A small single-story timber-frame building containing 150 square feet served as a hospital coop. There was also a metal and wood structure 125 square feet in area used as a storehouse. Another small timber-framed structure containing approximately 160 square feet was used as a shop. There was a timber-framed garage containing approximately 668 square feet. This building lacked one door and was in a dilapidated condition. There were also 11 so-called range houses on the property, which we do not consider, inasmuch as the experts testified that it was no longer the common practice in the area to range chickens. These buildings were obsolete.
While the farm structures were adequate and suitable to the purpose for which they were intended, they were for the most part homedesigned and homemade structures and were not the structures which the claimant’s expert contemplated. This expert, in estimating reconstruction costs, provided for buildings designed by a professional architect and constructed by expert union artisans under the supervision of such architect, including the costs and fees thereby entailed. It is obvious that this expert allowed reconstruction costs for structures superior to those in question. We note also that his estimate included the range houses, which we have eliminated from consideration since they were obsolete at the time of the taking. Moreover we find it impossible to accept this expert’s evaluation of the garage building, in view of its dilapidated condition. For the reasons indicated we regard Mr. Jacks’ estimate of the sound value of the buildings as being somewhat in excess of the true sound value of the structures at the time of the appropriation. But, nevertheless, we think such values are more realistic than those of Mr. Greenstein, the State construction expert, and have considered Mr. Jacks’ testimony accordingly, in conjunction with that of Mr. Benton, the real estate appraiser, who utilized this sound value appraisal in his appraisal of fair market value.
*399 Passing to a consideration of the sound value of the structures in the opinion of Mr. Greenstein, the State’s expert, we note that he has failed to supply any detailed description or breakdown of the costs of labor and materials for the structures other than his estimate for building No. 6. He claimed that he used what he characterized as a practical rule-of-the-thumb method, based upon his experience to determine his estimate of sound value.
He admitted overlooking many important items, and his estimates of certain work, particularly electrical and plumbing, were rather cursory. Moreover he was unaware of many of the features of the buildings. We also note that Mr. Rosen, the State’s real estate expert, did not use Mr. Greenstein’s reproduction costs. If he did, the appraisal of the value of the subject property before the appropriation would have been over $24,000 less than that to which Mr. Rosen testified, despite the fact that Mr. Rosen’s testimony indicated a belief on his part that the use of reproduction costs would generally lead to a value in excess of the market value.
We also note that Mr. Rosen placed a value approximately $7,000 more than that placed upon building No. 6 by the construction expert. While we accept Mr. Greenstein’s view of the garage and consider certain observations he made of the main building, for the reasons stated, we have given more consideration to the sound value testimony of Mr. Jacks.
Mr. Tuttle, a local egg farmer appearing in behalf of the State, testified to his opinion of the value of certain buildings on the basis of a unit price per square foot. In general, his unit price, per square foot of space, was comparable to that of Mr. Green-stein. The price quoted by this witness was a general one and he made no detailed inspection or appraisal of the buildings; we have considered it accordingly.
The claimant’s real estate expert worked in collaboration with the engineer who testified to sound value and adopted the figures of this latter expert, to which he added his valuation of the land, for his appraisal of fair market value before the appropriation.
In view of the fact that the buildings were adequate and constituted an enhancement of the land, we have given consideration to the appraisal method of this expert. (Matter of City of New York [Blackwell’s Is. Bridge], 198 N. Y. 84; Matter of City of New York [North Riv. Water Front], 219 App. Div. 27, 37.)
We are impressed with the experience and knowledge of Mr. Rosen, the State’s real estate expert, with respect to the market value of egg-producing farms of a smaller capacity than the subject property, and have regarded his appraisal of the fair *400 market value of the property after the appropriation accordingly. However, we regard his appraisal of the market value of such property before the taking in a different light. "We have already noted that Mr. Eosen disregarded the sound value of the structures in his appraisal, and relied upon his personal opinion of what a willing buyer would pay. He however admitted he had no knowledge of sales of comparable property and never sold an egg-producing farm of a capacity comparable in size and capacity to the subject property. Thus, we conclude that his opinion of the prior value is, at best, an educated guess. We also note that the structural value he placed on building No. 6 alone was equal to one third of his estimate of the value of the whole farm, including land. We have concluded that despite the faults already commented upon, the approach of the claimant’s expert’s valuation, based upon land value plus sound value, is the better one in this case and have considered it accordingly.
The claimant seeks the sum of $3,710 for the cost of gravel roads and wire fencing. The real estate experts have properly included these items in their value of the land. We have done likewise.
The claimant also seeks reimbursement in the amount of $34,314 for machinery, fixtures and equipment located in the buildings and used in egg production as a separate item of damage. Neither real estate expert included this machinery or equipment in his appraisals of value.
The correct rule is to value those fixtures which have become a permanent part of the realty as part of the realty, and not separately, and to eliminate from consideration such machinery and fixtures which have not been installed so as to become part of the realty or whose removal would not cause injury to the realty or fixture itself. (Matter of City of New York [Whitlock Ave.], 278 N. Y. 276; Matter of City of New York [North Riv. Water Front], 192 N. Y. 295; Jackson v. State of New York, 213 N. Y. 34.)
We find the following equipment was permanently attached to the realty so that removal thereof would cause injury to the realty or fixture itself, as follows: elevators, feed elevator, and hoist, heating cables, all thermostats except those in the egg room, switches, fans, shutters, roosts. All other equipment including the automatic feeders, waterers, nests, shell hoppers, dropping frames, etc., we find were not permanently installed so as to become part of the realty. Moreover this equipment, was easily removable without damage to itself or to the buildings. We also find that there was a local market for such equip *401 ment so that it has a market value separate and apart from the buildings, rather than mere salvage value.
We arrived at a sound value for the permanent equipment in building No. 6 in the amount of $3,500. With respect to the other buildings, we have found the sound value of the permanent fixtures was $3,800. Since these fixtures enhanced the real property we have considered the value thereof in assessing the value of the buildings.
The claimant’s experts included the temporary easements in his evaluations of the damages without making a separate allotment therefor. In fact he considered the easements to be of no specific value. The State’s expert allowed the sum of $238 for the temporary easements. We have considered the temporary easements and included damages for such takings in our award.
The claimant has received the sum of $51,000 from the State of New York as partial payment.
We find that the value of the claimant’s property including fixtures prior to the appropriation was $257,300; the value of the claimant’s property after the appropriation was $40,650. The claimant has been damaged in the sum of $216,650, including consequential damages. The claimant is entitled to an award against the State of New York in the sum of $216,650, less $51,000, or $165,650, with interest thereon from September 3,1958, to the date of entry of judgment. The court has viewed the property. Let judgment be entered accordingly.