Bergan, J. (dissenting).
The legal issue on which this court remanded the case to the Special Term for further consideration was narrow in scope. It may be stated without undue elaboration as a direction to the Supreme Court to give due consideration to the value of the intangible property of claimants. The majority opinion in this court stated flatly (18 N Y 2d 212, 222), concerning the original decision, that “ no allowance was made for the going concern items ”. The minority view was, among other things, that the total award in excess of $30 million embraced whatever going concern value existed.
Although the city continues to urge the point, based on several distinct grounds, that there was no going concern value at all and especially none in excess of the original award, it seems preferable to consider that the decision of this court settled this legal issue against the city by holding there was, indeed, value to “ going concern attributes or so-called intangible assets” in addition to the award for tangible property.
But, of course, this court did not hold, and it had no power within the frame of its constitutional jurisdiction to hold, what that value was. The quantum of damage in New York is a Supreme Court question. Even if a party be entitled to damage as a matter of law if there is a loss, where the fact-finder is able to say justly and within the record that there is in actuality no real value in the thing taken, he is free to do so.
*629 If, for example, the records of the claimants were so inefficiently maintained, obsolete, and inaccessible that they would in. fact be of no value to a successor by purchase or condemnation in continuing the business, there seems no conceivable legal reason why the city should pay for them as though they had value, even though useful records taken over might, as a general matter, be thought to be compensable.
Attempting to follow the direction of this court on remand to find the value of going concern assets, the Justice at Special Term acted conscientiously and responsibly. He allowed some items and disallowed others. In doing this he acted within the exact frame of his constitutional and statutory jurisdiction.
In reviewing the facts the Appellate Division affirmed his evaluations. If on any possible reasonable view of the record these factual conclusions could have been reached by fair-minded Judges, this court should not try to interpose its possibly different factual views on value. The rule applies as well to whether there is reliable proof of any damage at all as to how much damage there has been where actual damage is shown.
In People ex rel. Kings County Light. Co. v. Willcox (210 N. Y. 479) cited by this court in its prior opinion (18 N Y 2d, p. 221) in support of the conclusion claimants are entitled to “ going concern value ”, it is made explicitly clear that “ going value ” must be appraised as “ a question of fact ” (supra, p. 492).
The appraisal of going concern value for a bus company is an elusive and difficult task, as this present record suggests. Much of “ value ” is a matter of opinion and of judgment and hence peculiarly within the ambit of fact-finding. The burden of establishing it above the allowance for tangible property is clearly with claimants (Kimball Laundry Co. v. United States, 338 U. S. 1,19-20).
Their proof rested heavily on opinion views. Some of it could well be deemed incredible by a careful Trial Judge; and highly speculative as well. In some areas the Judge did not credit parts of this testimony, although the city did not in express terms refute it. But few things are better settled than that the trier of the fact is not bound helplessly by opinion evidence offered by a party having the burden. And if he takes it to be incredible *630 or can be said fairly not to be required to believe it, he is not bound to accept it.
Even where there is no testimony “ to contradict ” the testimony of experts, the "weight to be given ’ ’ to opinion evidence is ordinarily “ entirely for the determination of the jury ” (Commercial Cas. Ins. Co. v. Roman, 269 N. Y. 451, 456-457). See, also, The Conqueror (166 U. S. 110); Head v. Hargrave (105 U. S. 45); People ex rel. Third Ave. R. R. Co. v. State Bd. of Tax Comrs. (212 N. Y. 472); Tubiola v. Baker (225 App. Div. 420); Brooklyn Hgts. R. R. Co. v. Brooklyn City R.R. Co. (124 App. Div. 896, affd. 196 N. Y. 502).
The Trial Judge could consider, on the general reliability and reasonableness of claimants ’ demand for going concern value and the credibility of their experts, the singular circumstance, for example, that between the first trial and the second trial on remand, claimants’ experts blandly increased the values they attributed to going concern assets by about $6,000,000. No change whatever in the value of those assets could possibly have occurred between the two trials.
This change which the court at Special Term could and did consider was from $24,575,300 to $30,363,300. On appeal, and in reviewing the facts, the Appellate Division not only agreed that the allowances made at Special Term were adequate (“ quite generous ”), but as to items for which no award was made it held there was a failure to present “ sufficient proof”, a fact evaluation, to support an award.
The ultimate test, of course, is one of fairness to claimants and to the city (People ex rel. Kings County Light. Co. v. Willcox, 210 N. Y. 479, 485, supra; see, also, The Minnesota Rate Cases, 230 U. S. 352). When one looks closely and objectively at the going concern intangibles put forth by claimants in seeking an additional award, it is not easy to escape the conclusion that the $2,500,000 granted at Special Term has amounted to fair compensation. This is demonstrable on analysis.
A substantial part of claimants’ damage, totaling nearly $7,000,000, was for two items called “ Route Development ” ($6,140,000) and “ Layout of Coach Routes ” ($730,000). Both were disallowed entirely by the court at Special Term. They are similar enough in principle to be treated together. The theory *631 of the route development part of the claim is that there would be initial losses when a bus route is first put into operation, which is part of the cost of development, until riders enough begin to use the lihe.
There was proof that claimants themselves had never incurred any cost in laying out their bus routes and there was proof that no initial losses had ever occurred in New York bus lines because of the newness of routes or would likely occur. The choices available to a route-maker of bus lines in New York are limited but obvious. The great north-south avenues must be used by any bus company in the appropriate directions; and all of them are used. The court could quite readily find that it did not take either imagination or expertise to decide where these routes would go. The east-west cross streets are just as obvious for selection. In the 1880’s, for example, there was a horse-car route over 23rd Street. It was followed by an electric street car line which, in turn, was superseded by a bus line. It requires no ingenuity to think this route necessary or to realize that the patronage was there without “ development ” and that all that was needed was to provide the bus service. This was equally true of the other main cross streets as well as of the north-south thoroughfares and of the main routes in other parts of the city.
These areas of population and business obviously needing bus service and along lines made plain by the city’s geography were in plain sight for claimants’ predecessors, for the claimants, and for any succeeding bus enterprise. Claimants did not create this patronage or use much imagination to map out routes where the buses should run.
The opinion evidence on which claimants based these portions of their claim was the merest theory, having no relevancy to the actual situation to which the court at Special Term was addressing itself. The ‘ ‘ cost of development ’ ’ was estimated by claimants’ witnesses to be equal to 10% of a year’s gross revenue. The Justice at Special Term found there was no evidence whatever of any loss of earnings in the development of claimants’ routes and it certainly cannot be said that he was wrong as a matter of law in arriving at this entirely reasonable opinion.
And he was likewise of opinion that no study “ was or would be required” to determine where buses should be operated in *632 Manhattan, nor was there satisfactory evidence as to the routes in The Bronx. The court’s conclusions are in accordance with any reasonable reading of the record and this court should not now venture on new initial fact evaluations.
The court at Special Term disallowed also the claim for operating systems, procedures and records which, under three headings, totaled over $3,500,000. One was for maintenance records. There was proof these records were rarely used, did not contain essential information, and were inefficient in over-all utility.
It became clear that the value of such records on sale or acquisition was not the cost of putting them together inefficiently, but their actual value for the future operation. The proof suggests that if cost of putting them together became the inescapable criterion, a wasteful and inefficient set of records would become more valuable by virtue of the mere expensive inefficiency of their compilation.
There was opinion evidence in the record that the operating systems were inefficient ‘ ‘ particularly with respect to maintenance ”, As to accounting records, one of claimants’ witnesses testified that if the accounting records of claimants had been destroyed he would not recommend their reproduction. There was evidence they were inefficiently maintained and the court could well have concluded, in disallowing this item of damage, either that these records had been entirely depreciated from whatever they had cost or that, in any event, they constituted no asset of value to a successor operator.
In this class, too, are personnel records, no claim for which had been made on the original trial. But, besides this, there was no competent proof of their cost of reproduction, nor, indeed, does there seem any escape from the Special Term’s conclusion that they would have no independent value for a successor operator.
The court allowed claimants $240,000 for operating schedules, described as ‘ ‘ the estimated cost of preparing schedules ’ ’ for bus runs. Claimants asked for $1,102,800. The normal procedure to work out these schedules would be to retain consultants to make the necessary studies. Claimants did not do this. The work was done by claimants’ staffs. It should have been easy *633 to show what it cost. This was not done. The only evidence in support of the claim was work sheets which did not persuade the Justice at Special Term of their reliability. He did not, as a matter of law, have to be persuaded by this kind of ambivalent proof and there is no legal basis to alter his fact-finding here. And the court could well have believed that theoretical bus schedules worked out by claimants bore little relevancy to the actual operation of the buses on the streets or that spacing their operations or fitting them into the patterns of traffic were notably successful either during claimants’ operation or thereafter.
The largest allowance made by the Special Term to claimants was in excess of $2,300,000 for “ trained personnel ”. The theory of this element is that claimants had gotten together an organization of people ready to carry on a bus service and that it would cost a new owner an initial investment to do this. There is in the record, however, a wide range of view as to what this was actually worth to any successor operator. Claimants sought over $15,700,000 for these items. Many of them are speculative in detail. It is particularly difficult to apply literally a theory of “ reproduction less depreciation ”, appropriate enough to telephone lines and railroad cars, to a group of human beings. The best one can do is reach estimates of training that are fair; but however one approaches the problem, these are likely to be theoretical.
The largest item in this group was for the bus drivers. They require training; but, on the other hand, they are not skilled technicians in the sense that physiotherapists or dental assistants are. The claimants’ theoretical estimate that it costs $1,527 to train a bus operator seems grossly excessive. This totaled up to over $5,800,000.
Bus drivers are, as the Special Term noted, licensed chauffeurs to begin with. The vehicles they operate are not much more difficult technically to run than trucks. Traffic problems are generally the same for all large vehicles. All modern drivers have to cope with them. For the rest, the bus drivers must learn where the stops are and how to let passengers on and off. They must try to avoid accidents in traffic; but so must truck drivers.
*634 The claimants charged $525 a driver for “ safety instruction ” and then additionally, after having given safety instruction, $500 for estimated ‘£ anticipated accidents ’ ’ in spite of the ££ safety ” instruction. The Special Term, as a fact evaluation, regarded these items together as £ £ fantastic ’ ’; they are at least unrealistic.
The allowance of $450 each by the Special Term for training bus drivers is fully justified by the record. There is no legal warrant for this court to interfere with it by substituting some other factual value judgment.
Claimants under this general heading additionally sought almost $3,300,000 for their maintenance force, shop and garage mechanics and helpers. The court allowed $300 for each mechanic and $200 for each helper, a total of $320,600. This Special Term developed in detail in its opinion the grounds for regarding claimants’ amounts both excessive and reduplicated. Moreover, there is proof that the maintenance force was inefficient and that labor difficulties for which claimants might be held responsible had greatly increased the cost of maintenance. One estimate of this increase reached $4,900,000 a year. In any event, the value of this force as trained and maintained by claimants could not as a matter of law be held in excess of $320,600, which was allowed on the basis of the per man value of training mechanics and helpers.
The amount claimed for administrative staff was almost $5,200,000. This averages $10,460 a man for the administrative staff. This is close to the cost of training a biologist. Some of these people were engaged in supervising claimants’ mechanical operations. There was proof which the court at Special Term credited that the maintenance system was “chaotic”; that it lacked “management, direction, follow-up and procedure”; that it was necessary to “ retrain ” its personnel. Many of the other personnel were bus supervisors.
It is not surprising that there was some unwillingness on the part of the Special Term to believe that claimants spent $10,460 each to train these people. The court’s allowance of $250,000 is adequate. For similar reasons, the allowance of $100 per employee for clerical employees was adequate; and the court was justified in rejecting any allowance for executive personnel.
*635 On the “ value ” of the trained personnel to which the new enterprise succeeded, some consideration must be given to the fact that there was a large unfunded pension obligation which had been allowed to accumulate by the claimants. This amounted to $58,000,000, almost $10,000 per man. This normally would be the legal obligation of claimants. The obligation to pay into a trustee’s hands a contractual pension benefit would usually accrue from week to week as the wages became due to an employee.
If claimants, for example, had not paid for gasoline which had been consumed in their operations, it could scarcely be felt that the new owner would have to pay for this. That they did not pay for the gas they used because they expected to be able to do so from revenues from future operations based on other gasoline is utterly irrelevant to the obligation that matured to pay for what they had consumed.
Yet pension obligations are not as clean-cut as this where a work force is continued and the failure of claimants to fund their pension system made it possible to say, as one expert did in his testimony, that “ this work force carried with it a liability in excess of $58 million for past accrued but unfunded pensions ”.
On the whole record, the allowances that have been made at Special Term for the trained work force of over $2,300,000 are justified as a matter of law on the record.
This court’s opinion on the prior appeal indicated that the city would be obliged to pay for franchises it condemned. Of course this, as a general rule, is true; and the refusal of Special Term to allow any money for this item was the main ground of the dissent at the Appellate Division. Yet this liability, too, depends on the facts. The court is not dealing with an abstract theory but with this case. Claimants asked $3,000,000 for the value of their franchises and operating rights and permits. The Special Term allowed nothing and the Appellate Division affirmed this on the facts.
In the first place there was only one perpetual franchise held by claimants. This was the Fifth Avenue route on Fifth Avenue to 135th Street. There were other routes partly perpetual and partly term. Not any of these routes were condemned by the city. The franchises that were condemned were nonexclusive. This *636 intimately and adversely affected their value. The Special Term held they had none. The city could at any time have competed with them or allowed other operators to have competed.
As to the franchises that were condemned, their utilization could only have been to permit the claimants to operate in competition with the city. It is not easy to see how these would have had any value. The court at Special Term held squarely they had no value.
The city’s proof was that the expiration of ‘ ‘ vital franchises ’ ’ had a strong adverse effect on any value to be attributed to them. The “value ” attributed by claimants to their rights, permits and franchises of $3,000,000 was based entirely on the payments made to the city for the rights exercised. But when these rights ended the obligation to pay ended and this seems to have no substantial relationship to “ value ” to the bus companies as the Special Term found. It is difficult to escape either the fairness or the reasonableness of this conclusion.
The allowance now made of $2,577,500, in addition to $30,353,542 for tangible assets already allowed, is by any measure fair and just compensation and the order should be affirmed.
Chief Judge Field and Judges Scileppi and Breitel concur with Judge Burke ; Judge Bergan dissents and votes to affirm in an opinion in which Judges Keating and Jasen concur.
Ordered accordingly.