## Moffat Appeal.

124

Argued January 12, 1960. Before Jones, C. J., Bell, Musmanno, Jones, Cohen, Bok and Eagen, JJ.

*William J. Oliver,* with him *J. Hayden Oliver, Paul H. Price,* and *J. Harry Morosini,* for appellant.

*James E. O'Brien,* with him *Henry E. Harner,* for appellee.

OPINION BY MR. JUSTICE COHEN, June 3, 1960:

These are appeals from an award of a State Mining Commission convened on the petition of Robert Y. Moffat, appellant in No. 84, under the State Mining Commission Act (Act of July 3, 1941, P.L. 259, amending Act of June 1, 1933, P.L. 1409, 52 PS §1501 et seq.) to determine the amount of coal owned by Moffat necessary to be left in place in order to give lateral and vertical support to certain portions of the Northeastern extension of the Pennsylvania Turnpike, and to award damages for the taking thereof. Diamond Colliery Company, appellant in No. 128, was granted permission to intervene in the proceedings before the State Mining Commission as the owner of a smaller portion of land condemned by the Pennsylvania Turnpike Commission. The Commission awarded to Moffat $1,064,614.60, and to the Diamond Colliery Company $3500 as damages for the coal and silt required to be left in place, including detention damages. By their appeals the appellants (1) contend that the damages awarded were inadequate and unsupported by any substantial evidence, and (2) ascribe error to the failure of the Commission to award detention damages for the full period between the date of condemnation and the date of final judgment on the award.

The appellants further question the dismissal of their appeal requesting a de novo jury trial by the Court of Common Pleas of Lackawanna County, but that matter is improperly before us and will not be decided. Subsequent to the award of the State Mining

Commission, the appellants filed an appeal with the Court of Common Pleas of Lackawanna County requesting a trial de novo on the grounds that they were entitled to such under the State Mining Commission Act. That court dismissed the appeal and quashed the proceedings on the grounds that the Pennsylvania Turnpike Commission was not a municipal or other corporation within the meaning of Section 8, Art. 16 of the Pennsylvania Constitution and consequently the appellants were not entitled to a jury trial under the proviso of the State Mining Commission Act allowing an appeal to the courts of common pleas where a party is constitutionally guaranteed a jury trial. The present appeals, however, are solely from the award of the State Mining Commission. There is no separate appeal from the order of the court below dismissing the appeal for a jury trial which was entered subsequent to the taking of the instant appeals. See, e.g., *Kerry v. Commonwealth*, 381 Pa. 242, 113 A. 2d 254 (1955). There being no separate appeal from that order, we cannot decide the question raised.

Generally speaking, the preliminary appraisement of damages resulting from the exercise of the right of eminent domain by the Commonwealth or its nominees is entrusted to a board of viewers. When coal is taken for the vertical and lateral support of lands, easements or rights-of-way of the Commonwealth, however, the legislature has chosen to set up a separate body to assess the resulting damages. This body, the State Mining Commission,[1] is empowered under the Act to determine,

---

[1] A State Mining Commission is composed of the president judge of the court of common pleas of the county in which the land, easement or right-of-way is situated, a member of the Public Utility Commission or an engineer designee, the Secretary of Mines or his designated representative, the head or representative of the condemning department, board or commission of the State, and an

*inter alia,* the amount of coal to be left in place for support purposes and to assess the damages suffered by the owner of the coal or any other person who suffers by the taking. In *Glen Alden Coal Company Case,* 350 Pa. 177, 182, 38 A. 2d 37 (1944), wherein we sustained the constitutionality of the use of this special body, Mr. Justice (later Chief Justice) STERN commented on the purpose of a State Mining Commission thus: "The question as to the amount of coal that should be left in place for the purpose of furnishing support to a highway or other land taken under the right of eminent domain, as well as the value of such coal, is one that requires enormous technical and expert knowledge and with which ordinary viewers would be utterly unable to cope. The determination of the value of *surface* lands is something within the intellectual ken of ordinary citizens, but the question of the extent and value of the 'third estate' is a subject requiring a comprehension of scientific principles and their application, and this fact justifies the creation of a different tribunal to deal with that problem. There is no reason why the legislature may not make such a tribunal a permanent body and confine its personnel to specialists and experts."

Not only does a Commission face the usual technical difficulties in determining damages for the taking of coal, but its task is made even more complex by the financial plight of the anthracite coal industry, a situation not only indicated by the record in the instant case but known as a matter of common knowledge. With the future existence of any market for anthracite coal highly dubious, a Commission must, of necessity, indulge in some speculative approximation in order to reduce to a present day or present worth figure the dam-

---

engineer designated by the owner of the lands condemned. Act of July 3, 1941, P. L. 259, §1, 52 PS §1501.

ages suffered by a condemnee because he is precluded from mining and marketing his coal in future years. Nevertheless, the Commission must reach a value, and to do so it combines its own expert knowledge with that of the expert witnesses called by the parties so as to arrive at some rational and just result.

Being in the main an engineering body, appropriately tempered by the inclusion of a member of the judiciary, greater leeway will be accorded the Commission's acceptance or rejection of expert testimony than will be the use of expert testimony by an unskilled board of view or jury. Necessarily, our scope of review as to the Commission's findings of damage will be solely directed to determining whether there is competent evidence in the record upon which the Commission, an expert body, could predicate its results, and that no error of positive law has occurred. Cf. *Payne Appeal*, 350 Pa. 22, 38 A. 2d 26 (1944). Compare *Brown & Vaughn Development Company v. Commonwealth*, 393 Pa. 589, 143 A. 2d 815 (1958) ; *Avins v. Commonwealth*, 379 Pa. 202, 108 A. 2d 788 (1954).

With this in mind, we turn to the appellants' specific objection that the awards were inadequate and unsupported by competent evidence. In the Moffat case, six experts, three for each party, gave their opinions as to the value of the coal taken and explained the basis thereof. The Turnpike Commission's witnesses gave estimates of value ranging roughly between $630,000 and $742,000, while the expert witnesses for Moffat ranged from $1,300,000 to $1,600,000. On the basis of the testimony of these witnesses, the State Mining Commission determined the damages to Moffat for the coal and silt taken to be $875,183. Moffat contends that the estimates of the expert witnesses for the Turnpike Commission were arrived at by legally erroneous methods and therefore should have been stricken from the record in their entirety. This being so, Moffat

argues, the sole evidence of value for the Commission to consider was that of Moffat's experts, and since the award by the Commission was some $500,000 lower than the lowest value given by any of Moffat's experts, the award could not have been founded on the only competent evidence in the record. With regard to the Diamond Colliery award, three experts testified, one for the Turnpike Commission and two for Diamond Colliery. Their opinions ranged from $3500 to $5100, the lowest opinion being that of the expert witness for the Turnpike Commission. Since the award granted Diamond, including detention damages, was $3500, Diamond argues that the Commission necessarily valued the coal at a figure below the lowest estimate given by any of the witnesses and therefore its award must have been founded on evidence outside the record and hence invalid.

The argument of both appellants completely ignores the function of a State Mining Commission as a specialist tribunal in the determination of the monetary damages suffered upon a taking. A Commission is not bound to accept any of the valuations given by the expert witnesses, including those of the condemning authority. So long as it acts upon competent evidence in the record, a Commission may arrive at its own independent determination of damages. Aside from an estimate of damages, the use of expert testimony is a means of presenting pertinent data to the Commission and of allowing the experts to advocate a method of valuation. The testimony of the expert witnesses as to their findings about the quality of coal condemned, recent sales, appropriate engineering tables, mining conditions, condition of tracks and seams, and similar data, is equally, if not more important than their final valuation of damages, for as a body of experts, a Commission may use this information to arrive at a value themselves.

Our examination of the record discloses that in addition to a stipulation as to the amount of coal taken, there was more than adequate testimony by the expert witnesses concerning the pertinent information necessary to arrive at a damage figure. Accordingly, the respective awards to the appellants for the coal and silt required to be left in place are affirmed.

We now come to the appellants' contention that the Commission erred by its failure to award detention damages for the full period between the date of condemnation and the date of final judgment on the award. Approximately five and one-half years elapsed between these two dates, but detention damages were awarded for only slightly more than three of those years. This lengthy lapse of time can be attributed in the main to the inherent technical difficulties involved in determining the extent as well as the value of the coal taken for support purposes. The resolution passed by the Pennsylvania Turnpike Commission on January 18, 1954, condemned approximately 160 acres of surface of Moffat's land along 4.3 miles of the Turnpike. It was not until September 29, 1955, some 20 months later, that the Turnpike Commission filed its bond and accompanying map specifying the exact lands required for construction purposes, thus allowing the appellants to resume mining of their unaffected coal. The next 27 months, until the petition for the convening of a State Mining Commission was filed by Moffat on January 9, 1958, can be best described as a period marked by delay and excuse by the parties in not reaching agreement as to the extent and value of the coal taken, and marked also by numerous differences between the parties with regard to the furnishing of mine maps and other pertinent information. Once the Commission was convened on January 9, 1958, however, the parties got together, and although technical difficulties caused extension of the hearings to July 30, 1959, (the date of the award and

order of the State Mining Commission) the negotiations and hearings were apparently conducted amicably and in good faith.

The Commission awarded detention damages for the period from January 18, 1954, the date of condemnation, to September 29, 1955, the date of the filing of the bond and accompanying map, because the Commission found that "the petitioner could not with reasonable diligence have ascertained the areas within which coal might be required to be reserved for support of the Turnpike, and consequently was not in a position to apply for the services of the State Mining Commission." It also awarded damages for the period between January 9, 1958, when Moffat filed his petition to convene a Commission, and July 30, 1959, the date of the award, because the Commission found that the appellants, "considering the substantial technical problems involved, proceeded with due diligence to investigate and determine the issues involved." No detention damages were awarded, however, for the time between the filing of the bond and map by the Turnpike Commission on September 29, 1955, and the time Moffat filed his petition to convene the Commission, because the Commission found that during that time appellants were in a position to apply to the Commission for a determination of their rights and damages, and that under the principles expressed in *Payne Appeal,* 350 Pa. 22, 38 A. 2d 26 (1944), the appellants were not entitled to detention damages for that period. It is for this latter period that the appellants contend they should have also been awarded damages.

The findings of the Commission reveal that it read the *Payne* case to mean that once the party who is affected by a condemnation is in a position to convene a Commission to determine his rights, his failure to do so deprives him of the right to claim detention damages for the period during which he delays. A careful read-

ing of the decision in *Payne Appeal,* however, reveals that the Court was not concerned with the problem of whether or not detention damages should have been awarded. Instead, we had for review a determination by a State Mining Commission that none of the coal of the petitioner over which the state highway had been constructed was necessary for the support of the right-of-way. There the condemnation for the right-of-way had taken place in 1938 and the highway construction ended sometime in 1939. The petitioner had not convened the Commission until 1942. Since the Commission found that none of the coal was necessary for support, the petitioner suffered no damages since he could now mine his own coal. There being no money damages owing to petitioner, the question of detention damages never arose. Petitioner argued, however, that he was entitled to some damages because, inter alia, by virtue of the condemnation he was legally unable to mine any coal in the condemned area until the Commission allowed him to do so. It was this loss we held to be self-inflicted on the ground that the petitioner could have convened the Commission at any time subsequent to the condemnation to determine his rights in this respect.

If the Commission seeks to apply the same rule with respect to detention damages, we think it would be unreasonable. There is little sense to a rule which penalizes a property owner for not having convened a Commission at the earliest possible moment so far as detention damages are concerned. To apply such a rule would only result in the filing of a petition therefor as a matter of course immediately after the bond and map are entered, so as to insure and protect the owner of his award. This would eliminate the possibility of any stipulation or settlement by amicable negotiations without the necessity of convening a Commission, and would in no way help to speed up the process of making a

final determination of either the amount of coal to remain in place or the damages suffered thereby.

A more sensible rule is what the law has in fact always been. An owner of private property which has been condemned and appropriated for public use is prima facie entitled to damages for the delay in payment of the sum awarded as reasonable compensation for the property taken. *Fidelity-Philadelphia Trust Company v. Commonwealth,* 352 Pa. 143, 42 A. 2d 585 (1945). The theory is that by the award of such "detention damages," the owner of the lands condemned by eminent domain is made whole and put in the same economic condition as though condemnation had not occurred. There is, however, no absolute right to such damages, and when the circumstances of the case disclose that the cause of the delay is the fault of the property owner, the claim therefor may be lost in whole or in part. *Waugh v. Commonwealth,* 394 Pa. 166, 146 A. 2d 297 (1958); *Wayne v. Pennsylvania Railroad Company,* 231 Pa. 512, 80 Atl. 1097 (1911). "Such fault may be evidenced by an unconscionable or excessive claim of damages by the owner of the property or by his refusal, as otherwise indicated, to negotiate for the amicable settlement of the property damages. 'But the law (does) not presume any such conduct on his (the owner's) part' ": *Fidelity-Philadelphia Trust Company v. Commonwealth,* supra at 145.

Under this rule, the condemnor will pay detention damages for the full period between the taking of the property and the final award or jury verdict unless the condemnee loses his claim or any part thereof due to his own delay. The rule applies regardless of when the Commission is convened, so that even afterwards, if the property owner stalls or is uncooperative, he may lose the right to claim detention damages in whole or in part. Desirably, the net result is that the condemnor is under a burden to work more rapidly toward

134

a final award so as to keep the detention damages small, and the condemnee is encouraged to be as co-operative as possible so as not to jeopardize his detention claim.

Since in the instant case the refusal to grant detention damages for the period in question was predicated upon the erroneous principle of whether or not the appellants were in a position to petition for the convening of a Commission, as opposed to the appellants being at fault in causing the delay in the final award, the award must in part be reversed. It is necessary to remand the case to the Commission for the purpose of having the Commission make a specific finding as to whether or not any delay during this period was the fault of the appellants. Absent such a finding, the Commission must award detention damages for the full period.

The award is thus affirmed as to the damages for the value of the coal, but is reversed and remanded for the purpose of determining whether detention damages should be awarded for the period or any part thereof between September 29, 1955 and January 9, 1958.