**UNITED STATES of America**

v.

**Thomas J. PECORA and Dante Martire, Defendants.**

**Crim. No. 71–134.**

United States District Court,
W. D. Pennsylvania.

Aug. 25, 1972.

Robert E. Wayman, of Wayman, Irvin, Trushel & McAuley, Pittsburgh, Pa., for defendant Thomas J. Pecora.

William S. Hays, Pittsburgh, Pa., for defendant Dante Martire.

## OPINION AND ORDER

MARSH, Chief Judge.

The defendants, Pecora and Martire, were indicted under § 501(c) of the Landrum Griffin Act (29 U.S.C.).[1] The indictment charged that on or about September 7, 1966, the defendants, while president and business manager, respectively, of Local Union 1058, International Laborers Union, AFL–CIO, a labor organization engaged in industry affecting commerce,[2] unlawfully and wilfully did convert to the use of another, to-wit, John S. LaRocca and Mary S. LaRocca, the sum of $61,500 of moneys and funds of such organization.

The jury found the defendants guilty. Each defendant timely moved for judgment of acquittal and, in the alternative, for a new trial. In my opinion the motions for judgment of acquittal should be granted.

From the evidence presented by the prosecution[3] it appears that in 1966, Local 1058 owned and occupied a building on Penn Avenue, Pittsburgh, Pennsylvania. At that time it seemed apparent that the Local might lose this property by condemnation to the Urban Redevelopment Authority for a Pennsylvania Railroad industrial park project.[4] On May 21, 1966, the 7-man Executive Board, which included both defendants, and a 4-man staff approved a motion that the building committee "go out and

Thomas A. Bergstrom, Sp. Atty., U. S. Dept. of Justice, Pittsburgh, Pa., for the United States.

1. "Any person who embezzles, steals, or unlawfully and wilfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both."

2. These facts were stipulated by the parties. See Stipulation.

3. I have viewed the prosecution's evidence and the reasonable inferences to be drawn therefrom in its most favorable light. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

4. GX 6: Executive Board Meeting of May 21, 1966; Resolution June 28, 1966, p. 1. Testimony of government witnesses, William H. Powderly and Louis D. Elesie, and defense witness, Lloyd F. Engle, Jr., Esq.

get bids on available property in the area".

On June 11, 1966, the Executive Board and staff, under unfinished business, received a report from the defendant Martire that the Building Committee had been investigating a property on Fifth Avenue; that the owner asked $150,000, and that he, Martire, had made a counter proposal for $100,000 on behalf of the Local Union. After a lengthy discussion the Board approved a motion authorizing the Building Committee to pay $135,000, if necessary, to buy the lot.[5]

No independent appraisement of the lot was ordered.

The lot in question was a vacant lot on uptown Fifth Avenue, Pittsburgh (GX 5) in use as a parking lot. It was owned by John S. LaRocca[6] and Mary S. LaRocca, his wife. For convenience this lot will be referred to as Lot 46.

On June 25, 1966, the Executive Board and staff received a report from the Building Committee that they had offered the owner $130,000 plus taxes; that it had been accepted; that the Union had 90 days to close the deal without forfeiting the deposit. The Board approved a motion to put $10,000 deposit on the property. There was discussion about getting commitments from other unions and the pension and welfare fund to rent space "if we decide to build a large building" on Lot 46.[7]

On June 27, 1966, a Special Membership Meeting was held; 400 members of Local 1058 attended. As the first item of business, the minutes of the Executive Board Meeting of June 11, 1966 were read. The membership unanimously approved a motion to "accept the minutes as read". Also, the minutes of the Executive Board Meeting held June 25, 1966 were read and were "by motion accepted as read", and "said motion was seconded and adopted by the membership." [8]

The Constitution of the International Hod Carriers' Building and Common Laborers' Union of America (GX 7) at H(f) provided:

> "The Executive Board shall not take any act authorizing or committing the Local Union to expend large sums of money, until and unless the same has been approved and adopted by vote of the membership at a meeting."

Government witness, Louis D. Elesie, was the Recording Secretary of Local 1058. His testimony indicated that approval of the minutes of the Executive Board was the procedure usually followed for membership approval of Executive Board action. Secretary Elesie testified that the action of the Executive Board relative to the purchase of Lot 46 was generally discussed at the meeting. It can hardly be doubted that the decision to purchase a vacant lot in Pittsburgh on which to construct a building large enough for a Union hall and to rent space to other unions and the pension and welfare fund was one designed for the benefit of the Local Union.[9] It was not disputed that plans were made and commitments to rent space were obtained from other unions and the fund. The subsequent decision a year or so later to forego the building plan does not negate the 1966 intentions to benefit.

---

5. GX 6: Executive Board Meeting of June 11, 1966.

6. John S. LaRocca in the past has received considerable notoriety in the news media as an individual allegedly engaged in organized crime. His name was quite prominent in the media in connection with this trial.

7. GX 6: Executive Board Meeting of June 25, 1966.

8. GX 6: Minutes of Special Meeting of Membership.

9. GX 6: Minutes of September 7, 1966. Testimony of government witnesses, William H. Powderly and Louis D. Elesie, and defense witness, Peter J. Livolsi, that the proposal was viewed as a good investment.

No motive other than to purchase a lot for the benefit of the Local Union was proved.[10] It was established by the evidence submitted by the government that in June, 1966, the agreement to purchase Lot 46 was not only to fill a need for the benefit of the Local but that the expenditure of $130,000 for the Lot was authorized and approved or ratified by the membership in accordance with the Constitution. *Cf.* United States v. Silverman, 430 F.2d 106 (2d Cir. 1970).

On June 28, 1966, the Executive Board, seven members participating, including both defendants, by Resolution [11] empowered the defendants and Herman A. Smith,[12] as Trustees on behalf of the Union, to hold title and manage Lot 46 to be purchased by the Union "in accordance with the authority and approval given by vote at the Special [Membership] Meeting of June 27, 1966".

The defendants and Smith as Trustees, executed an agreement of sale with the LaRoccas dated June 22, 1966 (GX 9). The agreement described Lot 46 and obligated the Union to pay $130,000, plus taxes, within 90 days; the sum of $10,000 to be paid at date of closing. On June 28, 1966, the Trustees executed a Union check payable to the LaRoccas for $10,000 (GX 11).

Thereafter, the defendants, as Trustees, applied to the Pittsburgh National Bank for a loan of $120,000, the balance of the purchase price. This bank was Trustee of a multi-union-employer pension and welfare fund in conjunction with a Board of Trustees composed of employer and employee representatives.

William H. Powderly, the bank's trust officer in charge of the loan, instructed the bank's chief appraiser, William E. Halboth, to make an appraisal of Lot 46.[13] On July 26, 1966, Mr. Halboth completed his appraisal and reported to the bank that this lot had a fair market value of $68,500 (DXs A, B, C). He used the comparable sales method in arriving at his opinion, comparing the prior sales of seven or eight other nearby properties upon which buildings were erected.

The loan of $120,000 was approved by the bank and the Finance Committee of the Pension Fund Trustees.

Mr. Powderly informed the defendants that Lot 46 had been appraised at only $68,500 and therefore additional collateral was required. Additional collateral was provided.

Mr. Powderly testified that he required approval of the loan by the Executive Board and the membership and was assured by counsel for Local 1058 that the membership had approved of the transaction and a copy of the Resolution adopted by the membership had been received.

It does not appear that the defendants, or either of them, ever informed the Executive Board or the membership of the Union that Lot 46 had been appraised by the bank at a fair market value of $68,500. They did report to the Executive Board from time to time of the progress of the loan and the purchase of the Lot for $130,000.[14]

On September 7, 1966, the bank on behalf of the pension fund issued a check

---

10. The government's offer to prove a long acquaintance or association between Pecora and LaRocca failed when the latter invoked the Fifth Amendment. If such fact had been established, because of LaRocca's notoriously tainted reputation, it may have given rise to speculation of guilt by association, but would have proved nothing. There was not the slightest hint that the defendants, or either of them, ever benefited financially from this transaction.

11. GX 6: Resolution.

12. Mr. Smith died two or three years ago.

13. Mr. Powderly testified that he ordered Halboth to make a "tight appraisal" of the Lot. This was denied by Halboth.

14. See GX 6: Minutes of Executive Board under dates of July 23, August 27, and September 7, 1966.

to the order of the defendants and Smith, as Trustees for Local 1058, in the sum of $120,000 (GX 2). The back of the check was endorsed "Pay to John S. LaRocca & Mary S. LaRocca" and signed by the trustees. The LaRoccas deposited the check.

In addition to Halboth, the government called two other qualified real estate experts who testified that on a basis of specified comparable sales, Lot 46 as of September 7, 1966 had a fair market value of $73,000 and $75,000, respectively.

The defendants called one qualified real estate expert, E. Lewis Averbach, who on the same basis testified that as of September, 1966, the Lot had a fair market value of $130,000. There was undisputed testimony that after the indictment was returned, Lot 46 was sold by the Union in December, 1971, for $130,000.

■ The jury accepted the value opinions of the three government experts. Thus, the finding that the defendants unlawfully and wilfully, with specific criminal intent, converted $61,500 to the use of the LaRoccas rests solely on the land value opinions of these expert witnesses. It is my opinion that on this basis the evidence does not show beyond a reasonable doubt that the defendants were guilty of conversion to the use of another.

Although it could be inferred from the opinions of the government experts that a large overpayment was made to the LaRoccas ranging from $55,000 to $61,500 and that such payment was attributable to venality, and that the failure of the defendants to bring the bank's appraisal to the attention of the Executive Board and the membership could support an inference of fraud and concealment, such inferences would be wholly grounded upon the expert opinions of land value. Standing alone, I think such evidence is insufficient to find beyond a reasonable doubt the criminal intent and the other essential elements of the crime charged, especially when the government's evidence shows that the Executive Board and the membership were openly and fully advised of the need for a new Union hall, were told the purchase price of the Lot, and they approved or ratified the transaction. At most, the evidence shows that the defendants, as fiduciaries, were guilty of negligence and poor judgment in failing to have an appraisal made prior to the execution of the agreement to purchase on June 28, 1966, and in failing to inform the Executive Board and the membership of Halboth's subsequent appraisal of $68,500 reported to the bank on July 26, 1966; at most, as fiduciaries, they may be liable civilly under §§ 501(a) and (b) of the Landrum Griffin Act, but not criminally.

■ Expert testimony involving land value is reluctantly permitted in civil cases out of necessity;[15] otherwise the jury would have to make the estimate without expert help. Expert opinions of land values are in reality informed estimates made by experienced persons skilled in the art of appraising. But it is well known that real estate experts can be retained to testify for either side and, biased or not, "enormous disparity" is frequently found in their opinions, and hence such opinions may be considered unreliable and speculative.[16]

As stated in United States v. 60.14 Acres of Land, Etc., 362 F.2d 660 (3d Cir. 1966), at page 668:

"All opinion evidence of market value is to some extent inherently speculative (see Kimball Laundry Co. v. United States, 338 U.S. 1, 6, 69 S.Ct. 1434, 93 L.Ed. 1765 (1949); United States v. Miller, 317 U.S. 369, 374–375, 63 S. Ct. 276, 87 L.Ed. 336 (1943)), for it seeks to describe in the form of a realistic event what is a theoretical con-

---

15. Nichols, Eminent Domain, § 18.41.

16. Brown & Vaughn Development Co. v. Commonwealth, 393 Pa. 589, 143 A.2d 815 (1958).

struction,—something which in fact did not occur."

The wide disparity of expert opinion is exemplified in the following Pennsylvania condemnation cases: In Brown & Vaughn Development Co. v. Commonwealth, 393 Pa. 589, 143 A.2d 815 (1958), the plaintiff's real estate experts testified that the damages were $64,400 and $72,700; the three experts for the Commonwealth testified that the damages did not exceed $8,000. The Board of View awarded $20,000; the jury on appeal awarded $57,800, remitted to $47,800.

In In re Appropriation and Taking of Lands, Etc., 400 Pa. 123, 161 A.2d 352, 355 (1960), three experts gave estimates of land value ranging between $630,000 and $742,000; three other experts ranged from $1,300,000 to $1,600,000.

In Stoner v. Metropolitan Edison Company, 439 Pa. 333, 266 A.2d 718 (1970), a Board of View awarded $8,000 land damages to the owner; on appeal the jury awarded $26,000. Plaintiff's experts estimated before-condemnation value at $150,000 and damages at $30,000; defendant's experts estimated prior value at approximately $90,000 and damages at $6,000.

In Morrissey v. Commonwealth, Dept. of Highways, 440 Pa. 71, 269 A.2d 866 (1970), the Commonwealth's experts before value ranged between $1,018,700 and $850,000; their after value between $995,700 and $825,000; damages between $23,000 and $25,000. The experts for plaintiff estimated before value between $1,030,500 and $1,119,563; after value between $910,500 and $982,313; damages between $120,000 and $137,250. The Board of View awarded $50,000; on appeal, the jury awarded $28,000; upon second trial, the jury awarded $70,000.

Thus, if a criminal conviction for conversion to the use of another could be sustained on opinion evidence of land value, fiduciaries who buy or sell real estate above or below expert appraisals would be in constant jeopardy of criminal punishment. Fortunately, however, such is not the case. No authority has been brought to my attention, and I have found none, in which a criminal conviction of a fiduciary has been grounded upon expert opinion evidence of land value.

In fact, hypothetical considerations point up the danger of permitting specific criminal intent to be inferred solely from opinion evidence of land value. For if prior to purchase, the defendants, as Trustees, had hired Mr. Averbach to appraise Lot 46, their judgment and good faith in executing the agreement to purchase for $130,000 would have been supported by his appraisal, even though erroneous. Likewise, the need then under consideration to find a suitable location in Pittsburgh to build a large building to accommodate a Union hall and rent-paying tenants may have induced authorization for the purchase of Lot 46 at $130,000 by the Executive Board and membership despite knowledge of the bank's appraisal of $68,500.

There was no direct proof that the defendants or either of them ever spoke to the LaRoccas about purchasing Lot 46; there was no proof that this transaction was personally negotiated by either of them.[17] There was no proof submitted by the government which showed that the defendants received any monetary award, commission, or any tangible benefit from the LaRoccas.

For the above mentioned reasons, it is my judgment that the facts, circumstances and opinions produced by the prosecution are insufficient to sustain a finding of specific criminal intent on the part of either defendant. Accordingly the verdict of guilty will be set aside.

An appropriate order will be entered.

---

17. Mr. Engle, the attorney for the Local Union, called by the defense, testified that his office ascertained that the LaRoccas owned Lot 46, and that he and the attorney for the LaRoccas negotiated the selling price.